PEOPLE v CORTEZ

Docket No. 298262. Submitted September 13, 2011, at Grand Rapids. Decided October 27, 2011, at 9:00 a.m. Vacated in part and remanded, 491 Mich 925.

Burton D. Cortez was convicted by a jury in the Montcalm Circuit Court, David A. Hoort, J., on two counts of being a prisoner in possession of a weapon and was sentenced as a second-offense habitual offender. Defendant appealed, alleging that the court erred by ruling that the Department of Corrections officer who questioned defendant following the discovery of two weapons in his cell was not required to provide him the warnings mandated by *Miranda v Arizona*, 384 US 436 (1966), before subjecting him to questioning and by admitting in evidence a recording of the incriminating statements defendant made during the questioning.

The Court of Appeals *held*:

1. The circumstances of the questioning in this case did not require *Miranda* warnings. The *Miranda* requirements were not intended to impede the on-the-scene questioning traditionally conducted by police officers when investigating a crime. Similarly, when *Miranda* is applied to a prison setting, it is also not intended to hamper the efforts of prison officials when investigating an offense committed in prison.

2. The primary rationale behind the *Miranda*-warnings requirement is to protect against the possibility of governmental agents compelling someone to make incriminating statements while in custody. *Miranda* warnings must be given when a person is subjected to custodial interrogation. Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way. Being restricted or deprived of freedom, in the context of prison, is relative to additional limitations being placed on a prisoner beyond simply being in prison.

3. Under the circumstances of this case, where defendant was questioned by a corrections officer regarding an offense within the prison and for the purpose of maintaining prison safety, defendant was presented with very limited evidence of his guilt, and he was restricted and isolated pursuant to departmental procedure when

dangerous weapons are found in an inmate's area of control, the questioning was more like general on-the-scene questioning and questioning essential to the administration of the prison than the type of custodial interrogation requiring *Miranda* warnings. *Miranda* warnings were not necessary under the circumstances. The trial court did not err by holding that there was no violation of defendant's Fifth Amendment rights.

4. The recording containing defendant's admissions that he made the weapons and hid them in his cell was highly relevant to establishing defendant's guilt. The statements in the recording regarding defendant's possible gang affiliation were relevant to explaining why defendant's cell was searched and possible reasons for him to be in possession of a weapon. The trial court gave a limiting instruction before playing only part of the recording to the jury. The probative value of the recording was not substantially outweighed by the danger of unfair prejudice. The trial court did not err by admitting the shortened version of the recording.

Affirmed.

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *Andrea Krause*, Prosecuting Attorney, and *Joel D. McGormley*, Assistant Attorney General, for the people.

State Appellate Defender (by *Peter Jon Van Hoek*) for defendant.

Before: O'CONNELL, P.J., and METER and BECKERING, JJ.

PER CURIAM. Defendant, Burton David Cortez, appeals as of right his convictions on two counts of being a prisoner in possession of a weapon, MCL 800.283(4), entered after a jury trial. The trial court sentenced defendant as a second-offense habitual offender, MCL 769.10, to concurrent terms of 24 to 90 months in prison.

At the time of the incident in question defendant was an inmate at the Carson City Correctional Facility. On

July 21, 2009, Michigan Department of Corrections (MDOC) officers discovered two weapons in defendant's cell during a search of a number of inmates' cells. Before trial, defendant moved to suppress a recorded statement taken during an interview with him after the weapons were discovered and in which he admitted possessing the weapons. At issue on appeal is whether the trial court erred by ruling that the MDOC officer who questioned defendant during the interview was not required to provide him with *Miranda*[1] warnings before subjecting him to the questioning and by admitting defendant's incriminating statements at trial. We affirm.

I

On July 21, 2009, a "siren drill" was carried out at the prison. Leading up to the drill there had been several assaults and fights involving suspected gang members; weapons were used and there were shots fired by corrections officers from the gun tower. On the morning of the drill, two homemade weapons had been found on an inmate who was a suspected gang member. Prison officials decided to conduct the siren drill to search for more weapons and identify inmates involved in the suspected gang activity.

Pursuant to protocol for the siren drill, all inmates were required to return to their cells for a lockdown, and the corrections officers then searched various cells for contraband. During the drill, an MDOC officer, Lieutenant Robert Vashaw,[2] provided other corrections

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[2] Lieutenant Vashaw testified at the suppression hearing in this matter and stated that at the time of this incident he was "an acting Inspector" for the facility.

officers with a list of suspected gang members whose cells were to be searched. Defendant's name was on the list.

MDOC Officer Robert Hanes explained that before a cell is searched, the corrections officers have the inmates step out one at a time, undergo a pat-down search, and then proceed to a day room while their cell is searched. According to defendant, about 30 minutes after the drill started, he was asked to leave his cell and was patted down.[3] He was then sent to a day room or activity room.

Officer Hanes searched the area of defendant's cell that was considered to be in defendant's area of control. The cell was basically divided so that defendant, who slept on the bottom bunk, had the left side of the cell and the inmate who slept on the top bunk had the right side of the cell as their areas of control. Officer Hanes found pieces of metal in a trash can on the left side of defendant's cell. He also noticed that a metal shelf was missing from defendant's desk. At that point, Lieutenant Vashaw directed that a thorough search of the cell be conducted. The search revealed a homemade shank, specifically a piece of sharpened metal that was inserted into a white plastic handle. The shank was stuck in the bottom bunk's framework on the under-side of the bed frame. Officer Hanes turned the shank over to Lieutenant Vashaw and then continued to search the cell. A second shank was found inside a corner of the mattress on the bottom bunk. The second shank was made of a piece of metal wrapped in a bluish cloth and was also turned over to Lieutenant Vashaw.

Lieutenant Vashaw testified that he took control of the shanks, "bagged and tagged" them, and placed

---

[3] Defendant did not testify at the suppression hearing, but he did testify at trial.

them in the Michigan State Police evidence locker. Once the shanks were in the locker, Lieutenant Vashaw no longer had control over them; only the state police had access to them. Lieutenant Vashaw testified that the two shanks were in the evidence locker when he later interviewed defendant but that the trash can containing the metal pieces may have been in the interview room during the interview. Defendant, on the other hand, testified that the shanks, which had been placed inside tubes, and the trash can, were all in the interview room.

Officer Vashaw testified that if an inmate is found with dangerous contraband, departmental policy calls for the inmate to be placed in segregation until his misconduct report is heard. On the basis of the items found in defendant's area of control, Officer Hanes prepared a misconduct report, and Lieutenant Vashaw ordered staff to escort defendant to a segregation cell or solitary confinement.[4] While in the segregation unit, an inmate must be handcuffed and escorted by a staff member whenever he leaves segregation.

Approximately an hour to an hour and a half after Officer Hanes found the second shank, Lieutenant Vashaw requested to speak with defendant. Because defendant was already in segregation, he was escorted in handcuffs to the control center to meet Lieutenant Vashaw.[5] According to the lieutenant, he had defendant come to the control center to be interviewed because inmates are often reluctant to speak openly in front of

---

[4] According to defendant, before being placed in segregation, he was ordered to quickly shower with his prison clothes on and was then strip-searched and given a brown jumpsuit to put on.

[5] Defendant testified that he had been in segregation for approximately 15 or 20 minutes when he was handcuffed and escorted to the control center.

others. Lieutenant Vashaw and defendant then went to a back office for the interview.[6]

According to Lieutenant Vashaw, defendant hesitated to speak at the outset of the interview and initially "denied everything." The lieutenant then told defendant that the evidence the corrections officers had obtained was "pretty damaging" and that two weapons had been found in defendant's area of control. Lieutenant Vashaw said that defendant needed to tell him what was going on inside the prison because violent events had recently occurred; defendant needed to tell him why he was making weapons or was in possession of weapons. The lieutenant testified that he never threatened defendant.

Lieutenant Vashaw further testified that defendant soon started to talk, and the lieutenant brought out a tape recorder. Defendant knew the recorder was running, and he did not hesitate to discuss the matter. On the recording, which was played, in part, for the jury, defendant said that the weapons were his and that gang members had forced him to make them. One weapon was for his own protection, and the other was to be sold. He also admitted selling a third weapon the previous day. Defendant also talked about gangs that operated within the prison. The interview lasted approximately 15 minutes, and defendant never sought to end the interview. After the interview, a staff member escorted defendant back to segregation pursuant to departmental policy.

According to defendant, Lieutenant Vashaw showed him the trash can and both shanks in the interview room. Defendant told the lieutenant that the items were not his, but then the lieutenant told him they

---

[6] The office belonged to the facility's "Inspector" and was being used at that time by Lieutenant Vashaw as "an acting Inspector."

could make a deal. Lieutenant Vashaw proposed that defendant either admit possessing the weapons, do his segregation time after his misconduct ticket was heard, and go home as scheduled in approximately 11 months, or the lieutenant could keep defendant from ever going home. Defendant testified that everything he admitted on the recording was untrue; he just said what he needed to say in order to get out of prison and go home.

Before trial, defendant moved to suppress his confession on the grounds that he was not given *Miranda* warnings and it was highly prejudicial because the recording of his confession mentioned the length of time he had been in prison and detailed gang-related activity. Defendant renewed his objection to the admission of the recording during trial.

At the suppression hearing, during direct examination, Lieutenant Vashaw testified about his reasons for placing defendant in segregation and interviewing him:

> *Q.* So—you end up in possession of that first weapon found?
>
> *A.* Well, he, Officer Hanes . . . gave it to me and I took possession of it then, yes.
>
> *Q.* Okay. And then were you called back to the cell, or somehow you found another—came into possession of another weapon from the defendant's cell?
>
> *A.* Well, I wanted to get control of the prisoner, so I instructed Officer Hanes to do—I want you guys to finish going through this cell because there could be possibly more weapons in here, and then I left with the weapon and the metal contraband. I called in some additional staff to take Mr. Cortez to segregation.
>
> *Q.* Okay. So, you moved him from the day room to . . .
>
> *A.* Segregation.
>
> *Q.* What's segregation? What's that, what . . .

*A.* Solitary confinement. They're placed in there for detention and various protection and they're also placed in there pending, what we call, investigation or due process. Pending . . . investigation until we finish looking in to this incident or pending due process until we write misconduct and then they have a certain amount of days to be heard on that misconduct.

*Q.* And that's all stuff that's done internally within the prison?

*A.* Correct.

\* \* \*

*Q.* Okay. And—and the reason, what is the reason he was put into segregation, at that point?

*A.* Because prisoner[s], when they're found with dangerous contraband which was the broken pieces of metal or a weapon, that's called a non bondable offense and for that reason, we're required to place them in segregation.

*Q.* This is all Department of Corrections policy?

*A.* Correct.

*Q.* Nothing that the police have directed you have to?

*A.* No.

\* \* \*

*A.* Well, after he's placed in seg[regation] . . . Officer Hanes . . . subsequently found the second weapon in his mattress.

\* \* \*

*A.* . . . Given the nature of what had been goin [sic] on for the past week, I wanted to talk to him [defendant] about the activity.

*Q.* For what reason?

*A.* To try to get a handle, make sure we—cuz [sic] it's not every day that you find two weapons on a guy and then

the same two weapons we found in his cell were similar to the first two we found in the start of the day. So, it's leadin [sic] me to believe we've got a gang problem going on, plus with the stuff that happened earlier in the week, I was trying to interview him find out what exactly was going on with those gang members or specifically in that level four unit.

*Q.* And—and you wanted information on the gang members because of what reason?

*A.* For prison safety. For future, I mean, if we got a war going on that's something we need to take control of.

\* \* \*

*Q.* Okay. Were you requested by any police agency to question him regarding the knives, the weapons that were found in his cell?

*A.* No, I was not.

*Q.* Did you even have any contact with any outside police agency like the State Police, prior to questioning him in any regard?

*A.* No, I did not.

In regard to the content of his interview of defendant, Lieutenant Vashaw testified:

*Q.* So, how does the conversation start? I mean what—what do you say to him?

*A.* Basically, what's going on out there? I mean, we found these weapons in your cell, . . . I want to know what—can you tell me what's going on. I mean, this doesn't look good, you know. And that's how it starts out.

*Q.* But again, you wanted to know what's going on because of what reason?

*A.* Prison safety, with—we're having these gang problems and I want to know are we expecting more trouble, are we—you know, is there more weapons floating around out there, you know, concerned about the prisoner and staff safety.

\* \* \*

*Q.* Did he tell you about the gang activity and his take on who's who—who's members of a gang and . . .

*A.* Yes.

\* \* \*

*Q.* Was that helpful to you, in terms of again, maintaining peace and order in the prison?

*A.* Yes, specifically, because one name he did mention was a prisoner named Cain (phonetic) and we had received previous information that some of the Gangster Disciples had actually put a hit out on one of our officers. And we believed it to be credible enough, we kept the officer out of the institution, out of the inside and that prisoner Cain (phonetic), he was telling me about was one of the suspected GD's that was going to stab this officer.

*Q.* GD is—is what?

*A.* Gangster Disciple.

*Q.* That's the name of a gang?

*A.* Yes.

Later during the suppression hearing, the court asked Lieutenant Vashaw whether the MDOC had any arrangement with the state police in regard to conducting interviews of inmates suspected of criminal activity:

*Q.* Does the department have any type of arrangement or policy with the State Police, that you folks will do the interview? So they don't have to come out?

*A.* No, they've never—they've never said that. Typically we give them whatever information we have and then we lay [sic] it to them if they would like to come out and talk to the . . .

*Q.* So, there's no DOC policy that the Inspector or someone else would do, or interview, possible defendants for the State Police?

*A.* Uh, uh. Not unless—I mean there's no policy on it, no, that I've ever seen.

*Q.* Okay. Was there an arrangement or an unofficial policy or anything like that?

*A.* ... [N]o sir ...

Defense counsel continued with a similar line of questioning on recross-examination:

*Q.* Is it your practice to provide those interviews to the State Police?

*A.* If we're going to seek prosecution, yes.

*Q.* Okay. So, whenever you might seek criminal prosecution, you provide, not only the physical evidence that you've put in their police locker, but you also provide a report?

*A.* If they want it.

*Q.* Okay.

*A.* I've—well I, typically I fill out—we give em [sic] a synopsis of what we've had. We tell em [sic] either ... verbally or, you know, in writing, what—what's transpired and we would like to seek prosecution on this inmate, you know, and I'm just talking in general, you know, for different instances. And they may come and talk to the inmate themselves or they may not. They may take the report we have, and use—just use that.

\* \* \*

*A.* They will usually come to the facility there after, and say what do [you] have? And then if we have a report or what—whatever evidence or information we have, we then give [it] to them.

The court then resumed its questioning of the lieutenant:

*Q.* The distinction I was trying to—to make, it seems like you guys do have an arrangement or a policy that if there's evidence, you put it into the State Police, what do you call it?

*A.* Evidence locker.

* * *

*Q.* Yes?

*A.* Yes.

*Q.* Okay. But you don't have any type of arrangements or policy that you will do the interview for the State Police?

*A.* Right. No, we don't.

The trial court denied defendant's motion to suppress and objections to the recording. The court determined that defendant was in custody and was being interrogated but that Lieutenant Vashaw's testimony was credible and that he was not "acting as a tool of the State Police." In so holding, the court cited *People v Anderson*, 209 Mich App 527; 531 NW2d 780 (1995), wherein this Court explained that "constitutional protections apply only to governmental action" and, therefore, that "a person who is not a police officer and is not acting in concert with or at the request of the police is not required to give *Miranda* warnings before eliciting a statement." *Id.* at 533, citing *Grand Rapids v Impens*, 414 Mich 667, 673; 327 NW2d 278 (1982). Additionally, the trial court in this case noted that "there were many good, legitimate reasons why the Department of Corrections followed up with an interview of the defendant, relating to the safety and security of the prison, not only corrections officers but also inmates. Also, in [an] effort to find out, not only what is going on, but whether there was a gang problem, and specifically what's going on in that unit."

Further, while the trial court denied defendant's motion to suppress and objections to the recording, it attempted to minimize the prejudicial effect of the recording by allowing only a shortened version of it to

be played for the jury. The shortened version eliminated any reference to defendant's length of incarceration. The court also gave a limiting instruction to the jury.

The jury returned a verdict of guilty on both counts of being a prisoner in possession of a weapon. Defendant was sentenced as described. He now appeals as of right.

II

Defendant argues that the trial court committed error that requires reversal by ruling that Lieutenant Vashaw, the corrections officer who questioned him, was not required to provide him with *Miranda* warnings before subjecting him to custodial interrogation, contrary to his Fifth Amendment rights, and therefore erroneously admitted his incriminating statements at trial. We disagree. Although the facts of this case fall in the middle area of a spectrum of cases in which the factual situations of some require *Miranda* warnings and others do not, the circumstances of the questioning in this case did not require *Miranda* warnings.

When reviewing a motion to suppress evidence of a confession, we defer to the trial court's findings of fact unless they are clearly erroneous. *People v Herndon*, 246 Mich App 371, 395; 633 NW2d 376 (2001). We review legal conclusions de novo. *Id.*

The protections of the Fifth Amendment, US Const, Am V, and Const 1963, art 1, § 17 have " 'been extended beyond criminal trial proceedings "to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." ' " *People v Honeyman*, 215 Mich App 687, 694; 546 NW2d 719 (1996), quoting *People v Schollaert*, 194 Mich App 158, 164; 486 NW2d 312 (1992), quoting *Miranda*, 384 US at 467. An exception

to the requirement that *Miranda* warnings be given is general on-the-scene questioning of citizens during the fact-finding process. *Miranda*, 384 US at 477-478. *Miranda* was not intended to impede the on-the-scene questioning traditionally conducted by police officers when investigating a crime. *Id.* Similarly, when *Miranda* is applied to prison settings, it is also not intended to hamper the efforts of prison officials when investigating an offense committed in the prison. See *Fields v Howes*, 617 F3d 813, 819 (CA 6, 2010), cert gtd *Howes v Fields*, 562 US ___; 131 S Ct 1047; 178 L Ed 2d 862 (2011). To conclude "that any investigatory questioning inside a prison requires *Miranda* warnings . . . could totally disrupt prison administration" and "torture [*Miranda*] to the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart." *Cervantes v Walker*, 589 F2d 424, 427 (CA 9, 1978), discussing *Mathis v United States*, 391 US 1; 88 S Ct 1503; 20 L Ed 2d 381 (1968).

The primary rationale behind the *Miranda*-warnings requirement is to protect against the possibility of governmental agents compelling someone to make incriminating statements while in custody. *Honeyman*, 215 Mich App at 694. *Miranda* warnings must be given when a person is subjected to a custodial interrogation. *Anderson*, 209 Mich App at 532. Custodial interrogation is " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *People v Hill*, 429 Mich 382, 387; 415 NW2d 193 (1987), quoting *Miranda*, 384 US at 444. Being restricted or deprived of freedom, in the prison context, is relative to additional limitations being placed on a prisoner beyond simply being in prison. *Cervantes*, 589 F2d at 428. In *Cervantes*, the United States Court of

Appeals for the Ninth Circuit evaluated the concept of restricting one's freedom in a prison environment:

> The concept of "restriction" is significant in the prison setting, for it implies the need for a showing that the officers have in some way acted upon the defendant so as to have "deprived [him] of his freedom of action in any significant way," [*Miranda*, 384 US at 444]. In the prison situation, this necessarily implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement. Thus, restriction is a relative concept, one not determined exclusively by lack of freedom to leave. Rather, we look to some act which places further limitations on the prisoner.
>
> In defining this concept we adhere to the objective, reasonable person standard and the same four factors we have employed under the "free to leave" test. *See United States v. Curtis*, [568 F2d 643, 646 (CA 9, 1978)]. Therefore, the language used to summon the individual, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the additional pressure exerted to detain him must be considered to determine whether a reasonable person would believe there had been a restriction of his freedom over and above that in his normal prisoner setting. Such a situation requires *Miranda* warnings. [*Id.*]

The *Cervantes* court held that a sheriff's deputy's questioning of the defendant inmate in that case was not an instance of custodial interrogation requiring *Miranda* warnings. *Id.* at 426, 429. The defendant had recently been involved in a fight with another inmate. *Id.* In response to the fight, a sheriff's deputy moved the defendant from one cell to another. *Id.* While the defendant was being questioned in the jail library by the shift commander, the deputy searched the defendant's belongings outside the library door, in accordance with "standard jail procedure when moving inmates." *Id.* at 427. The deputy found a matchbox

containing a green odorless substance, which he suspected was marijuana, among the defendant's belongings. *Id.* at 427. He was not *certain* of what the substance was, however, because he had no specific training in identifying marijuana. *Id.*

> [The deputy] took the matchbox and contents into the library in order to have [the defendant] identify the substance. The library dimensions were about six feet by four feet. In the presence of [the shift commander], and at a distance of about one and one-half feet to two feet from [the defendant], [the deputy] opened the matchbox, showed the contents to [the defendant] and asked, "What's this?" [The defendant] replied, "That's grass, man." [The deputy] then placed [the defendant] under arrest. The matchbox contained a usable quantity of marijuana. [*Id.*]

The *Cervantes* court reasoned that under the circumstances, the deputy's questioning was an instance of on-the-scene questioning to determine whether a crime was in progress, rather than an instance of custodial interrogation. *Id.* at 429. The court noted that the marijuana was discovered during a routine search and that the deputy's questioning sought to ascertain the nature of the substance, took place in the prison library, and was apparently a spontaneous reaction to the discovery. *Id.*

More recently, in *Wilson v Cain*, 641 F3d 96 (CA 5, 2011), the United States Court of Appeals for the Fifth Circuit evaluated the physical circumstances of a prisoner during questioning. The defendant inmate was involved in an altercation with another inmate, whereafter he and the other inmate were handcuffed and taken to separate rooms for " 'post-fight interview[s].' " *Id.* at 98. During his interview, the defendant indicated that he had " 'stomped on' " a third inmate, which he demonstrated by jumping up and down three times, with both feet coming off the floor. *Id.* The corrections

officer conducting the interview testified that up to that point he had been unaware that a third inmate was involved in the altercation. *Id.* The third inmate was then discovered lying on a floor, injured to the extent that he was rendered totally disabled. *Id.* The defendant was charged with attempted second-degree murder. *Id.* Before trial, the defendant moved to suppress his statements during the interview because he had not been given *Miranda* warnings. *Id.* The trial court denied the motion, and the defendant was convicted of attempted manslaughter. *Id.* at 98-99. The Fifth Circuit evaluated whether *Miranda* warnings were required preceding the defendant's postfight interview, given the defendant's physical circumstances:

> [The defendant] was handcuffed, isolated from the rest of the prison population and questioned in an office, from which he was not free to go at any point during the interview. These physical circumstances, while as a general matter supportive of [the defendant's] right to *Miranda* warnings, nonetheless do not present a situation where it was unreasonable for the state court to have found that *Miranda* warnings were not necessary. Such a finding is not contrary to Supreme Court precedent, because *Mathis* did not describe the physical circumstances of the interrogation. Further, [the defendant's] physical circumstances were only slightly more indicative of custody than the circumstances in the circuit court cases of [*United States v Conley*, 779 F2d 970 (CA 4, 1985)] and *Cervantes*, where *Miranda* warnings were not required. *See Conley*, 779 F.2d at 971 (inmate questioned while handcuffed in small conference room in prison "control center," where he was awaiting transfer to the infirmary for medical treatment needed following the altercation); *Cervantes*, 589 F.2d at 426-27 (inmate questioned in small prison library, where the inmate was awaiting a move to another cell). Furthermore, [the defendant] was isolated from the prison population as a part of the prison's usual immediate "post-fight" procedure, designed to protect the safety of the prison by

ensuring non-contact with the other inmates and securing the area. And . . . a victim of [the defendant's] assault, and [the defendant] were both handcuffed and subjected to the same sort of routine immediate post-fight questioning in separate rooms. [*Id.* at 103-104.]

But see *Fields*, 617 F3d at 822-823 (holding that the "critical issue" in determining whether a defendant inmate has been subjected to custodial interrogation is "whether the prisoner is isolated from the general prison population for questioning" as "isolation is perhaps the most coercive aspect of custodial interrogation," and thus, that a "bright line approach" without "fact-specific inquiries" should be applied).

The *Wilson* court further found that a particularly important factor in determining whether a prisoner is entitled to *Miranda* warnings is whether the questioning was conducted by a prison guard or an outside state official:

One fact having particular importance is that [the defendant's] questioning was conducted by a guard employed at the prison in which he was incarcerated, rather than by an outside state official. This fact distinguishes this case from the relevant Supreme Court cases in which the interrogations found to require *Miranda* warnings were undertaken by outside state officials. *See Mathis*, [391 US at 3 n 2] (IRS agent questioned inmate); [*Maryland v Shatzer*, 559 US___, ___; 130 S Ct 1213, 1215–1216, 1224; 175 L Ed 2d 1045, 1049, 1057-1058 (2010)] (police detective not affiliated with prison questioned inmate). In contrast, in all of the analogous circuit court cases in which *Miranda* warnings were found unnecessary, the questioning of the prisoner had been undertaken by a member of the prison staff. *See Conley*, 779 F.2d at 971-73 (questioning by prison guard); *Cervantes*, 589 F.2d at 428 (questioning by the deputy sheriff, who worked at the county jail where defendant was being held); [*United States v Scalf*, 725 F2d 1272, 1275 (CA 10, 1984)] (questioning by correctional officer

employed at prison). In *Conley*, the Fourth Circuit explic-
itly contrasted statements made by the defendant to a
prison guard, on the one hand, and statements made to an
FBI investigator, on the other hand; the court noted with
approval the exclusion from evidence of statements made
to the FBI investigator because he was "in a different
category . . . He's an outside agent who has come in."
*Conley*, 779 F.2d at 974 n. 5. The Ninth Circuit in *Cervantes*
also stressed this factor, distinguishing *Mathis* by stating
that "[t]he questioning of Mathis by a government agent,
not himself a member of the prison staff, on a matter not
under investigation within the prison itself may be said to
have constituted an additional imposition on his limited
freedom of movement, thus requiring *Miranda* warnings."
*Cervantes*, 589 F.2d at 428. Finally, in *Fields v. Howes*,
which is now pending before the Supreme Court, the Sixth
Circuit distinguished its facts from those of the other
circuit court cases just discussed *because* the questioning
was by "state agents unaffiliated with the prison" rather
than on-the-scene questioning by prison officials. *Fields*,
617 F.3d at 821 (and also because the questioning con-
cerned "criminal conduct that took place outside the jail or
prison," *id.* at 820). [*Wilson*, 641 F3d at 103.]

See also *Anderson*, 209 Mich App at 533, and the cases
cited therein.

The *Wilson* court finally stated that the overall
circumstances of the questioning, specifically whether
the corrections officers were aware that the defendant
may have committed a crime or were merely investigat-
ing what they believed to be a routine matter at the
prison, pursuant to standard prison procedure, was
relevant in determining whether the questioning was
investigatory or accusatory. *Wilson*, 641 F3d at 104,
citing "*Cervantes*, 589 F.2d at 428 (listing 'extent to
which he is confronted with evidence of his guilt' as a
factor in determining whether an inmate was 'in cus-
tody.')." Considering all the circumstances, the court
held that "because the questioning was conducted by

members of the prison staff, using the prison's routine immediate 'post-fight' procedure to ensure the safety of the general prison population," the trial court did not err by concluding that "this was more like general on-the-scene questioning . . . rather than a custodial interrogation" requiring *Miranda* warnings. *Wilson*, 641 F3d at 104.

In this case, leading up to defendant's interview, several assaults and fights involving suspected gang members broke out in the prison. On the morning of July 21, the day of the interview, two homemade weapons had been found on a suspected gang member. Lieutenant Vashaw conferred with prison officials, and they decided to conduct a siren drill, wherein all inmates were required to return to their cells for a lockdown, and the corrections officers searched cells to find contraband and identify inmates involved in the suspected gang activity. After two homemade weapons were found hidden in defendant's cell, in his area of control, defendant was transferred to a segregation cell, and Officer Hanes filed a misconduct report. Lieutenant Vashaw testified that departmental procedure requires him to place inmates in segregation "when they're found with dangerous contraband[;] that's called a non bondable offense," and "pending, what we call, investigation or due process. Pending . . . investigation until we finish looking in to this incident or pending due process until we write [a] misconduct [report] and then [the inmates] have a certain amount of days to be heard on that misconduct [report]," which is "all . . . done internally within the prison."

Lieutenant Vashaw interviewed defendant within an hour and a half of the weapons' being found in his cell. Corrections officers escorted defendant, who was handcuffed, to and from the interview, again pursuant to

departmental procedure. Lieutenant Vashaw met defendant in the control center and then interviewed him in a back office belonging to the prison's Inspector, away from other inmates. In the beginning of the 15-minute interview, the lieutenant told defendant that the evidence the corrections officers had obtained was "pretty damaging" and that two weapons had been found in defendant's area of control. He said that defendant needed to tell him what was going on inside the prison because violent events had recently occurred; defendant needed to tell him why he was making weapons or was in possession of weapons. Once defendant began responding to Lieutenant Vashaw's questions, the lieutenant started a recorder, which defendant knew was running. During the recorded portion of the interview, defendant admitted possessing the weapons and described gang activity occurring in the prison.

In regard to the physical circumstances of the questioning, like the defendant in *Wilson*, defendant's freedom was restricted in that he was handcuffed and isolated in a back office away from the rest of the prison population. See *Wilson*, 641 F3d at 103-104. We note that in *Wilson*, the defendant engaged in an altercation with another inmate before being questioned and was isolated to ensure noncontact with the other inmates and secure the area. *Id*. at 98, 103-104. Here, defendant did not engage in any violent activity leading up to his interview. But both defendants were restrained and isolated pursuant to departmental procedure. See *id*. Dangerous weapons were recovered from defendant's cell, for which a misconduct report was filed. Departmental procedure required that he be placed in segregation and handcuffed whenever outside of segregation. Further, like the corrections officers in *Wilson*, see *id*., Lieutenant Vashaw interviewed defendant for safety purposes. During his testimony, which the trial court

found credible, the lieutenant explained that, given the recent violent activity in the prison involving suspected gang members and the fact that the weapons found in defendant's area of control closely resembled the weapons found on another suspected gang member earlier that morning, he "wanted to talk to [defendant] about the activity" and try to "find out what exactly was going on with those gang members or specifically in that level four unit." The lieutenant testified that he wanted to know what "was going on" for "[p]rison safety, with— we're having these gang problems and I want to know are we expecting more trouble[?] [A]re we—you know, is there more weapons floating around out there[?] . . . [I was] concerned about the prisoner and staff safety." During the interview, Lieutenant Vashaw attempted to elicit information from defendant that would be helpful in maintaining prison safety, and defendant provided such information, particularly the name of a gang member suspected of "putting a hit out" on one of the corrections officers.

Further, according to Lieutenant Vashaw, he did not confront defendant with evidence of his guilt other than some general, opening statements regarding "pretty damaging" evidence—two weapons—being found in defendant's area of control. See *Cervantes*, 589 F2d at 428. The lieutenant did not describe the weapons or the particular places where they were found. He testified that the weapons were not in the interview room and that the trash can containing the broken metal pieces may have been in the room but that he did not recall showing it to defendant. In *Cervantes*, while the deputy questioned the defendant as, apparently, a spontaneous response to the discovery of the matchbox filled with marijuana among the defendant's belongings, the deputy believed that the substance he had discovered was marijuana, and, when he asked the defendant to

identify it, he showed both the matchbox and its contents to the defendant while they were alone in a small room with only the shift commander. *Id.* at 427. Even under those circumstances, the *Cervantes* court held that the deputy's questioning was not an interrogation. *Id.* at 429.

It is also particularly important that defendant was questioned by Lieutenant Vashaw, who is an MDOC officer and not an outside state official, regarding conduct occurring within the prison. See *Wilson*, 641 F3d at 103; *Anderson*, 209 Mich App at 533. We note that there is clearly a cooperative relationship between the MDOC and the Michigan State Police. Lieutenant Vashaw placed the two shanks found in defendant's cell in the state police evidence locker, and he explained at the suppression hearing that corrections officers report any information they obtain regarding possible criminal violations to the state police, if requested to do so. We further acknowledge that there may be circumstances under which a corrections officer wears "two hats" in that the officer seeks to both investigate criminal activity or possible criminal activity as a part of prison administration *and* conduct a custodial interrogation. But we do not find that to be the case here. Lieutenant Vashaw restrained and isolated defendant pursuant to departmental procedure and repeatedly testified that by interviewing defendant he was not acting in the place of a police officer. He was not asked by any outside agency to interview defendant, and his purpose in conducting the interview was to elicit information from defendant that would be helpful to maintaining prison safety, considering the recent violent and possibly gang-related activity occurring in the prison. Again, the trial court found Lieutenant Vashaw's testimony to be credible, and we do not find clear error in that regard.

Although this case presents a close call because defendant was questioned by a corrections officer regarding an offense within the prison and for the purpose of maintaining prison safety, he was presented with very limited evidence of his guilt, and he was restrained and isolated pursuant to departmental procedure when dangerous weapons are found in an inmate's area of control, we find that the questioning was more like general on-the-scene questioning, see *Miranda*, 384 US at 477-478, and *Fields*, 617 F3d at 819, and questioning essential to the administration of a prison, see *Cervantes*, 589 F2d at 427, than the type of custodial interrogation requiring *Miranda* warnings. *Miranda* warnings were not necessary under the circumstances and to require them would unreasonably impede prison administration. Thus, the trial court did not err by finding no violation of defendant's Fifth Amendment rights.

III

Defendant further argues that, even if his Fifth Amendment rights were not violated, the recording of his statement was admitted in violation of MRE 403 because it was unfairly prejudicial since it included information that he was possibly affiliated with two gangs. We disagree.

We review a trial court's decision to admit evidence for an abuse of discretion. *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010). The abuse-of-discretion standard recognizes that there may be no single correct outcome in certain situations. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). Instead, there may be more than one reasonable and principled outcome. *Id.* When the trial court selects one of these principled outcomes, it has not abused its discretion,

and the reviewing court should defer to the trial court's judgment. *Id.* An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes. *Id.*

MRE 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Evidence may be considered unfairly prejudicial if there is a danger that " 'marginally probative evidence will be given undue or preemptive weight by the jury.' " *Mardlin*, 487 Mich at 627, quoting *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998).

In this case, the recording contained an admission by defendant that he had made the two weapons, one for himself and one to sell, and hid them in his cell. The recording was, therefore, highly relevant to establishing defendant's guilt. But, as defendant notes, the recording also contained statements of possible gang affiliation. We note, however, that other evidence of defendant's gang affiliation was presented to the jury before the recording was played. Lieutenant Vashaw testified that the MDOC keeps a list of suspected gang members and that defendant's name was on the list. Lieutenant Vashaw also testified that, because of the increased violence in the prison, he directed a search of cells belonging to suspected gang members, including defendant's cell. The evidence of defendant's suspected gang affiliation was relevant to explaining why his cell was searched and possible reasons for him to be in possession of a weapon.

Furthermore, in addition to reducing the length of the recording played for the jury, the trial court gave the jury the following limiting instruction:

> If you find that the defendant was a prisoner, that fact, plus any testimony relating to his incarceration or gang activity, is no evidence otherwise of the defendant's guilt in this case. You should not think just because that he was a prisoner, or that there was testimony relating to his incarceration or gang activity, that the defendant did something wrong or committed the crimes charged in this case.

We conclude that the probative value of the recording was not substantially outweighed by the danger of unfair prejudice. Any prejudice to defendant was minimal, considering the other evidence of defendant's gang affiliation admitted at trial and the trial court's limiting instruction. Accordingly, the trial court did not abuse its discretion by admitting the shortened version of the recording.

Affirmed.

O'CONNELL, P.J., and METER and BECKERING, JJ., concurred.