PEOPLE v CORTEZ (ON REMAND)

Docket No. 298262. Submitted June 20, 2012, at Lansing. Decided March 12, 2013, at 9:05 a.m. Leave to appeal sought.

Burton D. Cortez was convicted by a jury in the Montcalm Circuit Court, David A. Hoort, J., of two counts of being a prisoner in possession of a weapon and was sentenced as a second-offense habitual offender. Defendant appealed, alleging that the court erred by ruling that the Department of Corrections' officer who questioned defendant following the discovery of two weapons in his cell was not required to provide him the warnings mandated by *Miranda v Arizona*, 384 US 436 (1966), before subjecting him to questioning and by admitting in evidence a recording of the incriminating statements defendant made during the questioning. The Court of Appeals affirmed, concluding that the circumstances of the questioning did not require the *Miranda* warnings. 294 Mich App 481 (2011). Defendant sought leave to appeal in the Michigan Supreme Court. While the application for leave to appeal was pending, the United States Supreme Court issued its opinion in *Howes v Fields*, 565 US ___; 132 S Ct 1181; 182 L Ed 2d 17 (2012), in which it addressed the proper test to apply for determining whether a prisoner is in custody for purposes of the *Miranda* warnings. The Michigan Supreme Court then, in lieu of granting leave to appeal, vacated the part of the Court of Appeals opinion holding that the failure to provide *Miranda* warnings did not violate defendant's Fifth Amendment rights and remanded the case to the Court of Appeals for reconsideration of that issue in light of *Fields*. 491 Mich 925 (2012).

On remand, in a lead opinion by METER, J., and a concurring opinion by O'CONNELL, P.J., the Court of Appeals *held*:

1. The determination of custody depends on the objective circumstances of the interrogation rather than the subjective views harbored by either the interrogating officer or the person being questioned. Courts, when determining whether a defendant was in custody, consider both whether a reasonable person in the defendant's situation would believe that he or she was free to leave and whether the relevant environment presented the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.

2. The *Fields* Court indicated that, in assessing the question of custody, a court must consider all the circumstances surrounding the interrogation in order to determine whether a reasonable person would have felt that he or she was not free to end the interrogation and leave. Relevant factors to consider include the location and duration of the questioning, statements made during the questioning, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.

3. An inmate's imprisonment alone is not sufficient to constitute custody for purposes of the *Miranda* warnings. Restraint on a person's freedom of movement is just the first step in the custody analysis and courts must also ask whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.

4. The *Fields* Court, after noting that the rule limiting the state's ability to initiate additional questioning after a suspect invokes his or her right to counsel does not apply when there is a sufficient break in custody between the suspect's invocation of the right to counsel and the initiation of subsequent questioning, concluded that because a break in custody can happen while a prisoner is serving his or her uninterrupted term of imprisonment, it must follow that imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*.

5. The *Fields* Court articulated three meaningful distinctions in the relative coerciveness of an interrogative setting as perceived by a free person compared to a prisoner. First, the initial shock that a recently arrested person might feel during an interrogation is not likely to be experienced by a prison inmate when the inmate is questioned. Second, a prisoner is unlikely to agree to talk to the police in the hopes that the prisoner will be able to go home if he or she cooperates. Third, a prisoner knows that law enforcement officers who question the prisoner probably lack the authority to affect the duration of his or her sentence or lack the power to give the prisoner early release on parole. In contrast, a person who is not incarcerated might feel compelled to talk out of fear of reprisal for remaining silent or out of hope for lenient treatment.

6. Questioning a prisoner in private, as opposed to questioning the prisoner in the presence of fellow inmates, does not necessarily convert a noncustodial situation to one in which *Miranda* applies.

7. Imposing additional restraints on a prisoner's freedom of movement, such as an armed escort to the interview room, does not necessarily suggest custodial interrogation because special security precautions may be standard procedures, an ordinary and

familiar attribute of life behind bars, regardless of the purpose for which an inmate is removed from his or her regular routine and taken to a special location.

8. With respect to the subject matter of the questioning, the distinction between events occurring inside the prison and events occurring outside the prison is not significant for purposes of determining whether a suspect is in custody. The threat to a citizen's Fifth Amendment rights that *Miranda* was designed to neutralize is neither mitigated nor magnified by the location of the conduct about which questions are asked.

9. Security precautions that are undertaken do not affect the custody analysis if the precautions are routinely employed when an inmate is transferred from place to place within the prison or when away from the prison population. The security precautions employed in this case were standard prison procedures that are routinely employed when weapons are found in an inmate's cell. These were conditions and restraints to which defendant would have been subjected as a matter of prison policy regardless of the interview. The custody analysis is therefore not changed by the security precautions employed.

10. A relevant distinction between *Fields* and this case is that unlike the defendant in *Fields*, defendant was not told that he was free to end the questioning and return to his cell. However, other coercive aspects of the interrogation that occurred in *Fields* are absent in this case.

11. Defendant's isolation from other prisoners did not create a coercive atmosphere suggestive of custody to which *Miranda* applies. In light of all the features of the interrogation, defendant was not in custody for purposes of *Miranda* when he was questioned. No violation of defendant's Fifth Amendment rights occurred.

Affirmed.

O'CONNELL P.J., concurring, wrote separately to point out that the *Miranda* principles properly protect free citizens' Fifth Amendment rights, but those principles, with their focus on custody and police interrogation, do not comport with the controls necessary in a prison setting. The *Miranda* principles would be better preserved and protected by adopting a different standard to govern corrections officers' interviews of inmates about violations of prison rules. The new standard would be a recognition that the judicially crafted *Miranda* procedures are not necessarily better able to protect inmates' rights than the procedures developed by corrections experts. By attempting to maneuver the multifaceted principles of *Miranda*

into the simple structure of prison safety administration, we risk shattering both the *Miranda* rationale and the prison safety structure. In developing a different standard for prisoners it should be recognized that prison inmates are in custody. Custody in this context is not a term of art but a reflection of the inmates' extremely restricted environment. The proper Fifth Amendment analysis to protect inmates' rights should balance the inmates' individual rights against the institutional procedures that ensure the safety of all inmates. The analysis should enable courts to afford proper deference to prison administrators' ability to implement procedures that are reasonable for inmates. The analysis should begin with a determination whether the corrections officer complied with standard prison procedures for interviewing inmates. If there was compliance, any confession received during the interview would be presumed admissible in a subsequent criminal action, unless the inmate could demonstrate that the standard procedure was objectively unreasonable, i.e., unduly coercive, under the circumstances. If there was a failure to comply with standard prison procedures, any confession would be presumed inadmissible, unless the prosecution in a subsequent criminal action could demonstrate that the procedure used was objectively reasonable, i.e., not coercive under the circumstances.

BECKERING, J., dissenting, would hold, on the basis of all the features of the interrogation in this case, that defendant should have been advised of his *Miranda* rights before he was questioned and, therefore, defendant's confession should have been suppressed. Defendant was in custody during the interrogation for purposes of *Miranda*. In comparison to the *Fields* case, there are factors in this case that suggest that defendant was not in custody. However, this case and *Fields* share similarities that demonstrate that defendant was in custody. Furthermore, this case is distinguishable from *Fields* in several respects that strongly illustrate that defendant was in custody. The treatment of defendant should be viewed as the functional equivalent of an arrest in a prison setting. The objective circumstances demonstrate that a reasonable person would not have felt free to terminate the interrogation. *Fields* does not stand for the proposition that a prisoner is not in custody for purposes of *Miranda* when the treatment that the prisoner is subjected to is standard prison policy. The *Fields* Court, when distinguishing a prisoner's living environment from the living environment of a person who is not serving a term of incarceration, focused on restrictions and prison procedures that are ordinary and familiar to a prisoner. It should not be presumed that all standard prison policies are ordinary and familiar to a prisoner. The public-safety exception to the *Miranda* rule only applies to objectively reasonable questioning necessary to protect the police or the public from immediate danger. The ques-

tioning in this case was not objectively reasonable questioning necessary to protect the police or the public from immediate danger. The public-safety exception did not apply in this case. The erroneous admission into evidence of defendant's statements made during the interrogation was not harmless error. It is not clear beyond a reasonable doubt that a rational jury would have found defendant guilty absent the error. Defendant's conviction should be reversed and the matter should be remanded for a new trial.

1. CONSTITUTIONAL LAW — SELF-INCRIMINATION — CUSTODIAL INTERROGATION — MIRANDA WARNINGS.

When a criminal defendant may have been subjected to custodial interrogation the totality of the circumstances is examined to determine whether the defendant was in custody at the time of the interrogation; the determination of custody depends on the objective circumstances of the interrogation rather than the subjective views harbored by either the interrogating officers or the person being questioned; courts, when determining whether a defendant was in custody, consider both whether a reasonable person in the defendant's situation would have believed that he or she was free to leave and whether the relevant environment presented the same inherently coercive pressures as the type of station house questioning at issue in *Miranda v Arizona*, 384 US 436 (1966); relevant factors include the location and duration of the questioning, statements made during the questioning, the presence or absence of physical restraints during the questioning, and whether the interviewee was released at the end of the questioning.

2. CONSTITUTIONAL LAW — SELF-INCRIMINATION — CUSTODIAL INTERROGATION — MIRANDA WARNINGS.

An inmate's imprisonment is not sufficient by itself to constitute custody for purposes of the safeguards set forth in *Miranda v Arizona*, 384 US 436 (1966); whether there was restraint on a person's freedom of movement is the first inquiry in the custody analysis but courts must also ask whether the relevant environment presented the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.

3. CONSTITUTIONAL LAW — SELF-INCRIMINATION — PRISONS AND PRISONERS — CUSTODIAL INTERROGATION — LOCATION OF CONDUCT ASKED ABOUT.

Questioning a prisoner in private, as opposed to questioning in the presence of fellow prisoners, does not necessarily convert a non-custodial situation to one in which the safeguards set forth in

*Miranda v Arizona*, 384 US 436 (1966), apply; imposing additional restraints on a prisoner's freedom of movement, such as an armed escort to the interview room, does not necessarily suggest custodial interrogation; it is not significant for purposes of determining whether a suspect is in custody whether the questions concern events occurring inside the prison or events occurring outside the prison; the threat to a person's Fifth Amendment rights that *Miranda* was designed to neutralize is neither mitigated nor magnified by the location of the conduct about which questions are asked.

4. CONSTITUTIONAL LAW — SELF-INCRIMINATION — PRISONS AND PRISONERS.

The determination whether a prisoner who was questioned in prison was in custody for purposes of the safeguards set forth in *Miranda v Arizona*, 384 US 436 (1966), should focus on all the features of the interrogation, including the language that was used in summoning the prisoner to the interrogation and the manner in which the interrogation was conducted; an inmate who is removed from the general prison population for questioning and is thereafter subjected to treatment in connection with the interrogation that renders the inmate "in custody" for practical purposes is entitled to the full panoply of protections prescribed by *Miranda*.

5. CONSTITUTIONAL LAW — SELF-INCRIMINATION — PRISONS AND PRISONERS — CUSTODIAL INTERROGATION.

Security precautions that are routinely employed when a prisoner is transferred from place to place within a prison or when away from the prison do not affect the analysis whether a prisoner who is interviewed in prison has been subjected to custodial interrogation for purposes of the safeguards set forth in *Miranda v Arizona*, 384 US 436 (1966); the fact that the prisoner was questioned about a matter involving conduct in prison, as opposed to conduct outside prison, is not a relevant consideration in determining whether custodial interrogation occurred; the removal of the prisoner from the general prison population for purposes of the interview may lessen the coercive aspects of an interview of a prisoner.

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *Richard A. Bandstra*, Chief Legal Counsel, and *David H. Goodkin*, Assistant Attorney General, for the people.

State Appellate Defender (by *Peter Jon Van Hoek*) for defendant.

ON REMAND

Before: O'CONNELL, P.J., and METER and BECKERING, JJ.

METER, J. This case is before us on remand from the Michigan Supreme Court. Defendant appeals as of right his convictions by a jury of two counts of being a prisoner in possession of a weapon, MCL 800.283(4). The trial court sentenced him, as a second-offense habitual offender, MCL 769.10, to concurrent prison terms of 24 to 90 months. In a previous opinion, we affirmed defendant's convictions. *People v Cortez*, 294 Mich App 481; 811 NW2d 25 (2011), vacated in part and remanded 491 Mich 925 (2012). Shortly after we decided our previous opinion, the United States Supreme Court decided *Howes v Fields*, 565 US ___; 132 S Ct 1181; 182 L Ed 2d 17 (2012). We are directed on remand to reconsider in light of *Fields* defendant's challenge under *Miranda v Arizona*[1] to the use of his confession at trial. *People v Cortez*, 491 Mich 925 (2012). We once again affirm defendant's convictions.

I. FACTS AND PROCEDURAL HISTORY

We set forth the relevant facts in our previous opinion:

At the time of the incident in question defendant was an inmate at the Carson City Correctional Facility. On July 21, 2009, Michigan Department of Corrections (MDOC) officers discovered two weapons in defendant's cell during a search of a number of inmates' cells. Before trial, defendant moved to suppress a recorded statement taken during an interview with him after the weapons were discovered and in which he admitted possessing the weapons. At issue

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

on appeal is whether the trial court erred by ruling that the MDOC officer who questioned defendant during the interview was not required to provide him with *Miranda* warnings before subjecting him to the questioning and by admitting defendant's incriminating statements at trial. . . .

On July 21, 2009, a "siren drill" was carried out at the prison. Leading up to the drill there had been several assaults and fights involving suspected gang members; weapons were used and there were shots fired by corrections officers from the gun tower. On the morning of the drill, two homemade weapons had been found on an inmate who was a suspected gang member. Prison officials decided to conduct the siren drill to search for more weapons and identify inmates involved in the suspected gang activity.

Pursuant to protocol for the siren drill, all inmates were required to return to their cells for a lockdown, and the corrections officers then searched various cells for contraband. During the drill, an MDOC officer, Lieutenant Robert Vashaw, provided other corrections officers with a list of suspected gang members whose cells were to be searched. Defendant's name was on the list.

MDOC Officer Robert Hanes explained that before a cell is searched, the corrections officers have the inmates step out one at a time, undergo a pat-down search, and then proceed to a day room while their cell[s] [are] searched. According to defendant, about 30 minutes after the drill started, he was asked to leave his cell and was patted down. He was then sent to a day room or activity room.

Officer Hanes searched the area of defendant's cell that was considered to be in defendant's area of control. The cell was basically divided so that defendant, who slept on the bottom bunk, had the left side of the cell and the inmate who slept on the top bunk had the right side of the cell as their areas of control. Officer Hanes found pieces of metal in a trash can on the left side of defendant's cell. He also noticed that a metal shelf was missing from defendant's desk. At that point, Lieutenant Vashaw directed that a thorough search of the cell be conducted. The search

revealed a homemade shank, specifically a piece of sharpened metal that was inserted into a white plastic handle. The shank was stuck in the bottom bunk's framework on the [underside] of the bed frame. Officer Hanes turned the shank over to Lieutenant Vashaw and then continued to search the cell. A second shank was found inside a corner of the mattress on the bottom bunk. The second shank was made of a piece of metal wrapped in a bluish cloth and was also turned over to Lieutenant Vashaw.

Lieutenant Vashaw testified that he took control of the shanks, "bagged and tagged" them, and placed them in the Michigan State Police evidence locker. Once the shanks were in the locker, Lieutenant Vashaw no longer had control over them; only the state police had access to them. Lieutenant Vashaw testified that the two shanks were in the evidence locker when he later interviewed defendant but that the trash can containing the metal pieces may have been in the interview room during the interview. Defendant, on the other hand, testified that the shanks, which had been placed inside tubes, and the trash can, were all in the interview room.

Officer Vashaw testified that if an inmate is found with dangerous contraband, departmental policy calls for the inmate to be placed in segregation until his misconduct report is heard. On the basis of the items found in defendant's area of control, Officer Hanes prepared a misconduct report, and Lieutenant Vashaw ordered staff to escort defendant to a segregation cell or solitary confinement. While in the segregation unit, an inmate must be handcuffed and escorted by a staff member whenever he leaves segregation.

Approximately an hour to an hour and a half after Officer Hanes found the second shank, Lieutenant Vashaw requested to speak with defendant. Because defendant was already in segregation, he was escorted in handcuffs to the control center to meet Lieutenant Vashaw. According to the lieutenant, he had defendant come to the control center to be interviewed because inmates are often reluctant to speak openly in front of others. Lieutenant Vashaw and defendant then went to a back office for the interview.

According to Lieutenant Vashaw, defendant hesitated to speak at the outset of the interview and initially "denied everything." The lieutenant then told defendant that the evidence the corrections officers had obtained was "pretty damaging" and that two weapons had been found in defendant's area of control. Lieutenant Vashaw said that defendant needed to tell him what was going on inside the prison because violent events had recently occurred; defendant needed to tell him why he was making weapons or was in possession of weapons. The lieutenant testified that he never threatened defendant.

Lieutenant Vashaw further testified that defendant soon started to talk, and the lieutenant brought out a tape recorder. Defendant knew the recorder was running, and he did not hesitate to discuss the matter. On the recording, which was played, in part, for the jury, defendant said that the weapons were his and that gang members had forced him to make them. One weapon was for his own protection, and the other was to be sold. He also admitted selling a third weapon the previous day. Defendant also talked about gangs that operated within the prison. The interview lasted approximately 15 minutes, and defendant never sought to end the interview. After the interview, a staff member escorted defendant back to segregation pursuant to departmental policy.

According to defendant, Lieutenant Vashaw showed him the trash can and both shanks in the interview room. Defendant told the lieutenant that the items were not his, but then the lieutenant told him they could make a deal. Lieutenant Vashaw proposed that defendant either admit possessing the weapons, do his segregation time after his misconduct ticket was heard, and go home as scheduled in approximately 11 months, or the lieutenant could keep defendant from ever going home. Defendant testified that everything he admitted on the recording was untrue; he just said what he needed to say in order to get out of prison and go home. [*Cortez*, 294 Mich App at 482-487 (footnotes omitted).]

Before trial, defendant moved to suppress his confession on the basis that he was not given *Miranda* warnings. *Id*. at 487. He additionally argued that the

admission of his confession would be unfairly prejudicial because his recorded confession mentioned the length of time that he had been in prison as well as his gang activity. *Id.*

At the suppression hearing, Lieutenant Vashaw explained that his purpose in questioning defendant was to obtain information about ongoing prison gang activity. *Id.* at 487-489. The lieutenant was concerned about maintaining prison safety. *Id.* at 489. In response to the prosecution's and the court's questioning, Lieutenant Vashaw denied that the Department of Corrections had any arrangement with the police with respect to conducting interviews of inmates who are suspected of criminal activity. *Id.* at 490-492. He had no contact with any outside police agency before he questioned defendant. *Id.* at 489.

The trial court denied defendant's motion to suppress the confession and overruled his objections to playing the recording for the jury. *Id.* at 492. The trial court concluded that although defendant had been in custody and subjected to interrogation, Lieutenant Vashaw was not acting in the place of a police officer and therefore was not required to give *Miranda* warnings. *Id.* The trial court also recognized that " 'there were many good, legitimate reasons why the Department of Corrections follows up with an interview of the defendant, relating to the safety and security of the prison, not only corrections officers but also inmates. Also, in [an] effort to find out, not only what is going on, but whether there was a gang problem, and specifically what's going on in that unit.' " *Id.*

The trial court allowed a shortened version of the recorded interview to be played at trial, without a reference to the length of defendant's sentence. *Id.* at 492-493. The court also gave a limiting instruction. *Id.* at 493.

On appeal, defendant argued that Lieutenant Vashaw was required to give him *Miranda* warnings before questioning him and that, therefore, the admission of his confession at trial violated defendant's Fifth Amendment right against self-incrimination. *Id.* at 493. We applied the "reasonable person" standard and the four factors of the "free to leave" test. *Id.* at 495. We indicated, quoting *Cervantes v Walker*, 589 F2d 424, 428 (CA 9, 1978), that " 'the language used to summon the individual, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the additional pressure exerted to detain him must be considered to determine whether a reasonable person would believe there had been a restriction of his freedom over and above that in his normal prisoner setting.' " *Cortez*, 294 Mich App at 495. We found the question to be a close one but concluded that the circumstances of the questioning did not require the *Miranda* warnings. *Id.* at 504. We concluded that "the questioning was more like general on-the-scene questioning" that was "essential to the administration of a prison" than custodial interrogation for which *Miranda* warnings are required. *Id.* We found no violation of defendant's Fifth Amendment rights.[2] *Id.*

Defendant filed an application for leave to appeal in the Michigan Supreme Court. While his application was pending, the United States Supreme Court decided *Fields*. *Fields* addressed the question of the proper test to apply for determining whether a prisoner is in custody for purposes of *Miranda*. In lieu of granting defendant's application, the Michigan Supreme Court vacated the part of our opinion addressing the alleged *Miranda* violation and remanded for reconsideration in light of *Fields*. *Cortez*, 491 Mich 925.

---

[2] In our previous opinion, we also rejected defendant's argument that the admission of the recorded conversation was unfairly prejudicial under MRE 403. *Cortez*, 294 Mich App at 504-506.

## II. ANALYSIS

### A. STANDARD OF REVIEW

Whether a person is in custody for purposes of the *Miranda* warnings requirement is a mixed question of law and fact that must be answered independently after a review of the record de novo. *People v Coomer*, 245 Mich App 206, 219; 627 NW2d 612 (2001). "[A]n 'in-custody' determination calls for application of the controlling legal standard to the historical facts." *Id*. We review for clear error a trial court's factual findings regarding the circumstances surrounding the giving of the statement. *Id*.; *People v Tavernier*, 295 Mich App 582, 584; 815 NW2d 154 (2012). We review de novo the trial court's ultimate decision concerning a motion to suppress. *Id*.

### B. PERTINENT LEGAL STANDARDS

Both the state and federal constitutions guarantee that no person shall be compelled to be a witness against himself or herself. US Const, Am V; Const 1963, art 1, § 17. To protect a defendant's Fifth Amendment privilege against self-incrimination, custodial interrogation must be preceded by advice to the accused that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966). We look at the totality of the circumstances to determine whether a defendant was in custody at the time of the interrogation. *Coomer*, 245 Mich App at 219. "The determination of custody depends on the objective circumstances of the interrogation rather than the subjective views harbored by either the interrogating officers or the person

being questioned." *Id.* at 219-220 (citation and quotation marks omitted). "When determining whether a defendant was 'in custody,' courts consider both whether a reasonable person in the defendant's situation would believe that he or she was free to leave and 'whether the relevant environment present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda.*' " *People v Elliott*, 295 Mich App 623, 632; 815 NW2d 575 (2012), lv gtd 491 Mich 938 (2012), quoting *Fields*, 565 US at ___; 132 S Ct at 1190.

### C. THE *FIELDS* DECISION

In *Fields*, two sheriff's deputies questioned a Michigan jail inmate, Randall Fields, about alleged sexual conduct with a 12-year-old boy that occurred before his incarceration. *Fields*, 565 US at ___; 132 S Ct at 1185. A deputy led Fields down one floor of the building and through a locked door to a conference room in another section of the facility. *Id.* at ___; 132 S Ct at 1185-1186. The deputies told Fields that he was free to leave and return to his jail cell at the beginning of and during the interview. *Id.* at ___; 132 S Ct at 1186. The deputies were armed, but Fields was not restrained. *Id.* The conference-room door was open at times and closed at times during the interview. *Id.* The questioning began between 7:00 p.m. and 9:00 p.m. and lasted for five to seven hours. *Id.* During the interview, Fields "became agitated and began to yell" when he was asked about the sexual-abuse allegations. *Id.* He ultimately confessed. *Id.* Fields was never given *Miranda* warnings. *Id.*

According to Fields, one of the deputies swore at him, told him to sit, and said that " 'if [he] didn't want to cooperate, [he] could leave.' " *Id.* Although Fields told

the deputies "several times during the interview that he
no longer wanted to talk" to them, he did not ask to
return to his cell. *Id.* After the interview, Fields waited
20 minutes for an officer to be summoned to take him
back to his cell. *Id.* Fields arrived at his cell long after
his usual bedtime. *Id.*

Fields was charged with criminal sexual conduct. *Id.*
He unsuccessfully moved in the trial court to suppress
his confession on the basis that he had been subjected to
custodial interrogation without *Miranda* warnings. *Id.*
Fields was convicted of third-degree criminal sexual
conduct and sentenced to 10 to 15 years' imprisonment.
*Id.* We affirmed his conviction and the Michigan Su-
preme Court denied leave to appeal. *Id.*; *People v Fields*,
unpublished opinion per curiam of the Court of Ap-
peals, issued May 6, 2004 (Docket No. 246041); *People v
Fields*, 471 Mich 933 (2004).

The United States District Court for the Eastern
District of Michigan granted Fields's petition for a writ
of habeas corpus. *Fields*, 565 US at ___; 132 S Ct at
1186. The United States Court of Appeals for the Sixth
Circuit affirmed, reasoning that a prisoner is in custody
within the meaning of *Miranda* if he or she has been
taken aside and questioned about events that occurred
outside the prison walls. *Id.* at ___; 132 S Ct at 1186-
1187. The Sixth Circuit's determination that Fields was
in custody for purposes of *Miranda* was based on three
factors: (1) Fields's imprisonment, (2) the fact that the
questioning was conducted in private, and (3) the fact
that the questioning involved events outside the prison.
*Id.* at ___; 132 S Ct at 1189.

The United States Supreme Court reversed. *Id.* at
___; 132 S Ct at 1194. In addition to correcting the Sixth
Circuit's interpretation of Supreme Court precedent,
the Court rejected the proposition that the three factors

cited by the Sixth Circuit were sufficient to create a custodial situation for purposes of *Miranda*. *Id*. at ___; 132 S Ct at 1187-1189.

The *Fields* Court initially indicated that, in assessing the question of custody, a court must consider all the circumstances surrounding the interrogation in order to determine whether a reasonable person would have felt that he or she was not free to end the interrogation and leave. *Id*. at ___; 132 S Ct at 1189. Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning. *Id*.

The Supreme Court then clarified that an inmate's imprisonment alone is not sufficient to constitute custody for *Miranda* purposes. *Id*. at ___; 132 S Ct at 1190. The Court cautioned that restraint on a person's freedom of movement is just the first step in the custody analysis. *Id*. at ___; 132 S Ct at 1189. Courts must also ask "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id*. at ___; 132 S Ct at 1190. The *Fields* Court cited *Maryland v Shatzer*, 559 US 98, ___ ; 130 S Ct 1213, 1223-1226; 175 L Ed 2d 1045 (2010), for the proposition that the rule in *Edwards v Arizona*, 451 US 477; 101 S Ct 1880; 68 L Ed 2d 378 (1981), limiting the state's ability to initiate additional questioning after a suspect invokes his or her right to counsel, does not apply "when there is a sufficient break in custody between the suspect's invocation of the right to counsel and the initiation of subsequent questioning." *Fields*, 565 US at ___; 132 S Ct at 1190. The *Fields* Court noted that, according to *Shatzer*, a break in custody can happen while a prisoner

is serving his or her sentence. *Id.* The *Fields* majority concluded that, by extension, "[i]f a break in custody can occur while a prisoner is serving an uninterrupted term of imprisonment, it must follow that imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda.*" *Id.*

The Court examined the relative coerciveness of an interrogative setting as perceived by a free person compared to a prisoner and articulated three meaningful distinctions. *Id.* at ___; 132 S Ct at 1190-1191. First, the initial shock that a recently arrested person might feel during an interrogation is not likely to be experienced by a prison inmate when the inmate is questioned:

> [Q]uestioning a person who is already serving a prison term does not generally involve the shock that very often accompanies arrest. In the paradigmatic *Miranda* situation—a person is arrested in his home or on the street and whisked to a police station for questioning—detention represents a sharp and ominous change, and the shock may give rise to coercive pressures. A person who is "cut off from his normal life and companions," *Shatzer*, [559 US] at ___, 130 S. Ct., at 1220, and abruptly transported from the street into a "police-dominated atmosphere," *Miranda*, 384 U.S., at 456, 86 S. Ct. 1602, may feel coerced into answering questions.
>
> By contrast, when a person who is already serving a term of imprisonment is questioned, there is usually no such change. "Interrogated suspects who have previously been convicted of crime live in prison." *Shatzer*, 559 U.S. at ___, 130 S. Ct., at 1224. For a person serving a term of incarceration, we reasoned in *Shatzer*, the ordinary restrictions of prison life, while no doubt unpleasant, are expected and familiar and thus do not involve the same "inherently compelling pressures" that are often present when a suspect is yanked from familiar surroundings in the outside world and subjected to interrogation in a police station. *Id.*, at ___, 130 S. Ct., at 1219. [*Fields*, 565 US at ___; 132 S Ct at 1190-1191.]

Second, a prisoner is unlikely to agree to talk to the police in the hopes that the prisoner will be able to go home if he or she cooperates. *Id*. at ___; 132 S Ct at 1191. "[W]hen a prisoner is questioned, he knows that when the questioning ceases, he will remain under confinement." *Id*. Third, a prisoner "knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence" or lack the power to give the prisoner early release on parole. *Id*. In contrast, a person who is not incarcerated might feel compelled to talk out of fear of reprisal for remaining silent or out of hope for lenient treatment. See *id*. The *Fields* majority concluded that "service of a term of imprisonment, without more, is not enough to constitute *Miranda* custody." *Id*.

The Supreme Court also rejected the Sixth Circuit's emphasis on the fact that the inmate was questioned in private:

> Taking a prisoner aside for questioning—as opposed to questioning the prisoner in the presence of fellow inmates—does not necessarily convert a noncustodial situation . . . to one in which *Miranda* applies. When a person who is not serving a prison term is questioned, isolation may contribute to a coercive atmosphere by preventing family members, friends, and others who may be sympathetic from providing either advice or emotional support. And without any such assistance, the person who is questioned may feel overwhelming pressure to speak and to refrain from asking that the interview be terminated.
>
> By contrast, questioning a prisoner in private does not generally remove the prisoner from a supportive atmosphere. Fellow inmates are by no means necessarily friends. On the contrary, they may be hostile and, for a variety of reasons, may react negatively to what the questioning reveals. In the present case, for example, would respondent have felt more at ease if he had been questioned in the presence of other inmates about the sexual abuse of

an adolescent boy? Isolation from the general prison population is often in the best interest of the interviewee and, in any event, does not suggest on its own the atmosphere of coercion that concerned the Court in *Miranda*. [*Id*. at ___; 132 S Ct at 1191-1192 (citation and quotation marks omitted).]

The *Fields* Court also stated that imposing additional restraints on a prisoner's freedom of movement, such as an armed escort to the interview room, does not necessarily suggest custodial interrogation. *Id*. at ___; 132 S Ct at 1192. The Court stated that "such procedures are an ordinary and familiar attribute of life behind bars. Escorts and special security precautions may be standard procedures regardless of the purpose for which an inmate is removed from his regular routine and taken to a special location." *Id*.

With respect to the subject matter of the questioning, the *Fields* majority concluded that the distinction between events occurring inside the prison and events occurring outside the prison is not significant for purposes of determining whether a suspect is in custody:

Finally, we fail to see why questioning about criminal activity outside the prison should be regarded as having a significantly greater potential for coercion than questioning under otherwise identical circumstances about criminal activity within the prison walls. In both instances, there is the potential for additional criminal liability and punishment. If anything, the distinction would seem to cut the other way, as an inmate who confesses to misconduct that occurred within the prison may also incur administrative penalties, but even this is not enough to tip the scale in the direction of custody. [*Id*.]

In sum, "[t]he threat to a citizen's Fifth Amendment rights that *Miranda* was designed to neutralize is neither mitigated nor magnified by the location of the

conduct about which questions are asked." *Id.* (citation and quotation marks omitted).

The Supreme Court concluded its analysis of the appropriate standards by stating, in part:

> When a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation. These include the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted. An inmate who is removed from the general prison population for questioning and is thereafter ... subjected to treatment in connection with the interrogation that renders him "in custody" for practical purposes ... will be entitled to the full panoply of protections prescribed by *Miranda.*" [*Id.* (citations and some quotation marks omitted).]

The Supreme Court determined that Fields was not in custody for purposes of *Miranda. Id.* The Court recognized the factors that militated in favor of a custody finding, such as the facts that Fields did not initiate or consent to the interview, the interview lasted five to seven hours and past Fields' regular bedtime, the deputies were armed, and one of them used a sharp tone and profanity. *Id.* at ___; 132 S Ct at 1192-1193. However, these factors were outweighed by other circumstances suggesting that Fields was not in custody when he was questioned. *Id.* at ___; 132 S Ct at 1193. Fields was told at the outset, and again during the interview, that he could return to his cell whenever he wanted. *Id.* He was not physically restrained and was not uncomfortable in the conference room. *Id.* Fields was offered food and water, and at times the conference-room door was open. *Id.* " 'All of these objective facts are consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave.' " *Id.*, quoting *Yarborough v Alvarado*, 541 US 652, 664-665; 124 S Ct

2140; 158 L Ed 2d 938 (2004). The *Fields* majority concluded: "Taking into account all of the circumstances of the questioning—including especially the undisputed fact that respondent was told that he was free to end the questioning and return to his cell—we hold that respondent was not in custody within the meaning of *Miranda.*" *Fields,* 565 US at ___; 132 S Ct at 1194.

### D. APPLICATION OF *FIELDS*

Defendant argues that *Fields* supports his position that he was in custody for purposes of *Miranda* when Lieutenant Vashaw questioned him. Defendant emphasizes that he was segregated from the general prison population, handcuffed, and confined in an office, which constituted more restrictive circumstances than the restrictions associated with his prison routine. In addition, defendant emphasizes that he did not volunteer to talk to the officers and that he was not told that he did not have to talk to them. He also notes that, unlike the mitigating circumstances in *Fields*, he was restrained, the door to the room was closed, and he was not told that he could return to his cell if he did not want to answer questions. Defendant contends that the totality of the circumstances establishes that he was in custody for purposes of *Miranda.*

We disagree. Although *Fields* alters our earlier analysis of the custody issue, it does not compel a different result.

*Fields* instructs that security precautions that are undertaken do not affect the custody analysis if the precautions are routinely employed when an inmate is transferred from place to place within the prison or when away from the prison population. *Id.* at ___; 132 S Ct at 1192. The record established that the security

precautions employed were standard prison procedures that are routinely employed when weapons are found in an inmate's cell. See *Cortez*, 294 Mich App at 485, 501, 503.[3] These were conditions and restraints to which defendant would have been subjected as a matter of prison policy regardless of the interview. See *Fields*, 565 US at ___; 132 S Ct at 1193 ("under no circumstances could he have reasonably expected to be able to roam free"). Thus, the custody analysis is not impacted by the security precautions undertaken. Also in accordance with *Fields*, the fact that defendant was questioned about a matter involving his conduct in prison, as opposed to his conduct outside prison, is not a relevant consideration. *Id.* at ___; 132 S Ct at 1192.

Admittedly, a relevant distinction between *Fields* and this case is that unlike Fields, defendant was not told that he was free to end the questioning and return to his cell. However, other coercive aspects of the interrogation that existed in *Fields* are absent here. Unlike Fields, who was questioned for up to seven hours late into the night, defendant's interview lasted only 15 minutes. *Cortez*, 294 Mich App at 486. Lieutenant Vashaw stated that defendant "did not hesitate to discuss the matter" even when he was aware that a tape recorder was running. *Id.* There was no evidence that defendant's sleep schedule was interrupted or that he was made uncomfortable. Lieutenant Vashaw testified that he never threatened defendant and the trial court found the lieutenant to be credible. *Id.* at 486, 492.

Additionally, we agree with the observation of the *Fields* majority that a prisoner's removal from the

---

[3] As noted in *Cortez*, 294 Mich App at 501, "Dangerous weapons were recovered from defendant's cell, for which a misconduct report was filed. Departmental procedure required that he be placed in segregation and handcuffed whenever outside of segregation."

general population might lessen the coercive aspect of the interview. See *Fields*, 565 US at ___; 132 S Ct at 1191-1192. Defendant was questioned about gang activity inside the prison and answered with specific information about prisoners and gangs. See *Cortez*, 294 Mich App at 490. In these circumstances, his isolation for purposes of questioning might have been more comforting than coercive. Indeed, Lieutenant Vashaw testified that he questioned defendant away from other prisoners because "inmates are often reluctant to speak openly in front of others." *Id.* at 485-486. Defendant's isolation from other prisoners did not create a coercive atmosphere suggestive of custody to which *Miranda* applies.

### III. CONCLUSION

In light of all the features of the interrogation, defendant was not in custody for purposes of *Miranda* when he was questioned. On reconsideration in light of *Fields*, we again conclude that no violation of defendant's Fifth Amendment rights occurred.

Affirmed.

O'CONNELL, P.J. (*concurring*). I concur that defendant's convictions must be affirmed. I write separately to address the broader issue whether, by attempting to maneuver the multifaceted principles of *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), into the simple structure of prison safety administration, we risk shattering both the *Miranda* rationale and the prison safety structure. Caselaw confirms that the *Miranda* principles are a vital set of judicially created and proliferated procedures that protect free citizens against the serious danger of coercive pressure during custodial police interrogations. As this case

demonstrates, however, these judicially created procedures may be ill-suited for use in the prison context.

### I. THE LIMITS OF *MIRANDA*

The *Miranda* principles safeguard citizens against self-incrimination. US Const, Am V; *Miranda*, 384 US at 439. Specifically, the *Miranda* warning procedures protect against the coercion that can occur when a citizen is suddenly engulfed in a police-dominated environment. See *Howes v Fields*, 565 US___, ___; 132 S Ct 1181, 1190; 182 L Ed 2d 17 (2012). In *Fields*, the Supreme Court described the typical scenario that triggers *Miranda* procedures:

> [A] person is arrested in his home or on the street and whisked to a police station for questioning—detention represents a sharp and ominous change, and the shock may give rise to coercive pressures. A person who is cut off from his normal life and companions and abruptly transported from the street into a police-dominated atmosphere may feel coerced into answering questions. [*Id*. at ___; 132 S Ct at 1190 (quotation marks and citations omitted).]

The *Fields* Court also noted that the *Miranda* principles have limited applicability: " 'Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, *but only in those types of situations in which the concerns that powered the decision are implicated.*' " *Id*. at ___; 132 S Ct at 1192, quoting *Berkemer v McCarty*, 468 US 420, 437; 104 S Ct 3138; 82 L Ed 2d 317 (1984) (emphasis added).

The locomotive that powered the original *Miranda* decision, and that prompted the Supreme Court to require police officers to recite *Miranda* warnings in certain circumstances, is the potential for police officers to use coercive pressure to obtain confessions from citizens taken into police custody. *Fields*, 565 US at ___;

132 S Ct at 1188-1189. Accordingly, the *Miranda* analysis centers on whether the interrogated citizen is "in custody." *Id*. at ___; 132 S Ct at 1189. For the *Miranda* analysis, "custody" is "a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Id*. This analysis, with "custody" as a term of art, is logical and effective when applied in the typical police-custody situation.

When, however, the interrogated citizen is a prison inmate, application of the *Miranda* analysis can lead not only to semantic confusion (custody within custody[1]) but to disruption of the prison safety system. A prison inmate lives in a custodial environment that would certainly seem coercive outside the prison context.[2] Given the vast differences in the daily circumstances of free citizens as compared to prison inmates, it seems to me that rather than forcing the *Miranda* analysis into the prison mold, we should consider an alternate analytical framework to protect prison inmates' Fifth Amendment rights.[3]

---

[1] See, e.g., Justice Ginsburg's partial dissent in *Fields*, 565 US at ___; 132 S Ct at 1194.

[2] See, e.g., Mich Dep't of Corrections Policy Directive 04.04.130 (Movement by Prisoners—Intra-Institutional).

[3] *Miranda* warnings are not part of our constitution. The warnings are simply a set of prophylactic measures designed to ward off inherently coercive pressures of custodial interrogation. *Fields*, 565 US at ___; 132 S Ct at 1188. The original *Miranda* decision was designed to mitigate the coercive environment created by police officers during custodial interrogation. Many decisions involving *Miranda* rely on two well-established elements to determine the degree of coercion: (1) whether the police have focused on a particular suspect and (2) whether the suspect is in custody. Significant to the present case is the fact that inmates are always in custody and the responsibility of corrections officers is to focus on the inmates 24 hours a day, 7 days a week.

Applying the coercive-elements test found in the original *Miranda* decision to the prison setting requires courts to reconfigure the original *Miranda* analysis so that it applies to (1) inmates incarcerated in prison, (2)

### II. INMATES' RIGHTS

Inmates retain certain constitutional rights, but those rights are subject to restrictions and limitations. *Bell v Wolfish*, 441 US 520, 545; 99 S Ct 1861; 60 L Ed 2d 447 (1979). The *Bell* Court explained:

> Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. The fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights. There must be a mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application. [*Id.* at 545-546 (quotation marks and citations omitted).]

### III. AN ALTERNATIVE TO *MIRANDA*

In this case, the lead and dissenting opinions each accurately apply the *Miranda* principles, but reach opposite conclusions. That two scholarly and reasonable judges could apply the same principles but reach divergent outcomes suggests that the principles themselves are problematic. While I do not claim to have the solution to this problem, and I recognize that as a state appellate judge I am not at liberty to adjust the *Miranda* process to better fit the prison setting, I do

who are under 24-hour supervision, and (3) who are being questioned by corrections officers (not police officers). In my opinion, the application of the traditional *Miranda* analysis to inmates is problematic and will lead to inconsistent results, as shown by the lead and dissenting opinions in this case. For further proof of this dichotomy, one needs to look no farther than the majority and the partial dissenting opinions in *Fields*. In this opinion, I suggest an administrative solution to the problem. Contrary to what the reader may initially perceive, I am not suggesting any diminution of an inmate's Fifth Amendment rights as they are set forth in our constitution. The proposed solution will, in my view, better protect inmates' Fifth Amendment rights.

have two suggestions that may prevent implosion of a standard that was created for one context and is currently being applied in an entirely different context.

First, I suggest we recognize the obvious: prison inmates are in custody. "Custody" in this context is not a term of art; it is a reflection of the inmates' extremely restricted environment. The *Fields* Court expressly concluded that being imprisoned does not constitute being in custody for *Miranda* purposes. *Fields*, 565 US at ___; 132 S Ct at 1191. Any judicial attempts to further parse the term "custody" for inmates results in the divergent opinions that occurred in this case. Instead, our analysis should recognize the obvious distinctions between inmates and other citizens.[4] The *Fields* Court recognized some of these distinctions, for example, "questioning a person who is already serving a prison term does not generally involve the shock that very often accompanies arrest." *Id.* at ___; 132 S Ct at 1190. And, "a prisoner, unlike a person who has not been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for prompt release." *Id.* at ___; 132 S Ct at 1191. Further, "a prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence."[5] *Id.* The *Fields* Court also recognized

---

[4] Justice MARY BETH KELLY recently recognized that situational distinctions are critical to a Fifth Amendment analysis by pointing out: "Courts should be mindful that, as compared to an adult, a juvenile suspect faces a more acute risk of succumbing to the inherent pressures of custodial interrogation . . . ." *People v White*, 493 Mich 187, 232; 828 NW2d 329 (2013) (MARY BETH KELLY, J., dissenting).

[5] At the trial in this case, defendant testified that the corrections officer indicated that he could prevent defendant from ever being released from prison. As the dissent points out, however, defendant's testimony was not part of his motion to suppress. Even if it had been presented in the motion to suppress, the testimony does not establish that defendant

that taking a prisoner aside for private questioning imposes an additional restriction on the prisoner. *Id*. at ___; 132 S Ct at 1192. The Court explained, however, that "such procedures are an ordinary and familiar attribute of life behind bars. Escorts and special security precautions may be standard procedures regardless of the purpose for which an inmate is removed from his regular routine and taken to a special location." *Id*. The types of standard procedures referred to in *Fields* are used in the Michigan corrections system. In particular, the Michigan Department of Corrections has developed routine procedures for interviewing inmates about rule violations. See, e.g., Mich Dep't of Corrections Operating Procedure 03.03.105 (Major Misconduct Processing). The procedures could be highly coercive outside a prison, but are necessary and standard within a prison.

Second, if, as I suggest, the *Miranda* "custody" analysis is unhelpful as it applies to inmates, courts must apply an alternate Fifth Amendment analysis to protect inmates' rights. The proper analysis should balance the inmates' individual rights against the institutional procedures that ensure the safety of all inmates. Compliance with prison rules and procedures is one aspect of ensuring inmates' safety.[6] When an inmate violates a rule, a corrections officer can and should respond quickly to identify the inmate involved and discover whether any danger exists. This rapid, efficient response must be available to corrections officers even

actually believed the corrections officer had authority to lengthen his sentence. Moreover, the *Fields* Court recognized that questioning about prison misconduct could result in administrative penalties, but that the risk of penalties did not necessarily render an inmate "in custody" for *Miranda* purposes. *Id*. at ___; 132 S Ct at 1192.

[6] See, e.g., Mich Dep't of Corrections Policy Directive 03.03.130(K) ("Staff have a responsibility to protect the lives of both employees and prisoners, provide for the security of the State's property, prevent escape, and maintain good order and discipline.").

if the rule violation could result in criminal charges against the inmate. To bind a corrections officer to the *Miranda* procedures every time the officer suspects a rule violation would be to pinion the officer's ability to protect the general prison population from the rule breakers. In my view, any rote application of the *Miranda* analysis to a prison safety interview is a failure to recognize the reality of the restrictive prison environment. Moreover, to require the use of the judicially created *Miranda* procedures in the prison context is to assume, incorrectly, that judges are more effective than corrections experts at designing prison procedures. As the Supreme Court recognized in *Bell*:

> [M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees. . . . [E]ven when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security. [*Bell*, 441 US at 546-547.]

In sum, the *Miranda* analysis should not control Fifth Amendment issues that may arise when a corrections officer interviews an inmate about a prison rule violation. Instead, the analysis should enable courts to afford proper deference to prison administrators' ability to implement procedures that are reasonable for inmates. The analysis should begin with a determination whether the corrections officer complied with standard prison procedures for interviewing inmates. If the officer complied with the procedures, any confession received during the interview would be presumed admissible in a subsequent criminal action, unless the inmate could demonstrate that the standard procedure was objectively unreasonable—i.e., unduly coercive—under the circumstances. If the correc-

tions officer failed to comply with standard prison procedures, any confession would be presumed inadmissible, unless the prosecution in a subsequent criminal action could demonstrate that the procedure used was objectively reasonable—i.e., not coercive—under the circumstances.[7]

I recognize that these suggestions could, at first glance, be viewed as a failure to follow the binding *Miranda* precedent. After careful consideration, however, it seems to me that these suggestions are fully consistent with the *Miranda* opinion's Fifth Amendment concerns. In my view, some of the post-*Miranda* decisions have myopically focused on the form of the "custody" analysis without considering the substance of that analysis. I ascribe to the long-held recognition that, as judges and lawyers, we must constantly guard against our "tendency to attribute undue importance to form as opposed to substance, and to exalt the immaterial to the level of the material." Salmond, Jurisprudence (6th ed, 1920), § 10, p 25. The material and substantive aspects of *Miranda* are the preservation and protection of Fifth Amendment rights. I offer my suggestions to open a discussion about whether strict adherence to the "custody" analysis is the best means of protecting the Fifth Amendment rights of inmates.[8]

---

[7] This approach is a refined application of the voluntariness standard that controls certain Fifth Amendment issues. See *Arizona v Fulminante*, 499 US 279, 285-288; 111 S Ct 1246; 113 L Ed 2d 302 (1991).

[8] In our prior opinion, this panel unanimously affirmed defendant's convictions and concluded that the Michigan Department of Corrections officer was not required to recite the *Miranda* warnings under the circumstances presented in this case and that the admission of defendant's recorded statements at his trial was not unfairly prejudicial under MRE 403. *People v Cortez*, 294 Mich App 481, 504-506; 811 NW2d 25 (2011), vacated in part and remanded 491 Mich 925 (2012). Central to our prior decision was our conclusion that the *process* used by the Department of Corrections in obtaining defendant's confession did not create the same coercive pressures as the type of station house questioning by

IV. CONCLUSION

To impose prison protections on free citizens would be tyranny; to impose free citizens' protections in prison would be anarchy. Neither situation is desirable. The *Miranda* principles properly protect free citizens' Fifth Amendment rights, but those principles, with their focus on custody and police interrogation, do not comport with the controls necessary in a prison setting. The *Miranda* principles would be better preserved and protected by adopting a different standard to govern corrections officers' interviews of inmates about violations of prison rules. The new standard would be a recognition that the judicially created *Miranda* procedures are not necessarily better able to protect inmates' rights than the procedures developed by corrections experts.[9]

For these reasons, I agree that defendant's convictions must be affirmed.

---

police officers at issue in the *Miranda* case, and therefore defendant's confession was admissible at his trial. While I still agree with our prior opinion, I am now convinced that the original *Miranda* warnings were not engineered to apply to inmates incarcerated in our state's prisons. Stated another way, as applied to prison inmates, there exists a design defect in the *Miranda* warnings.

[9] The primary purpose of this opinion is not to address safety and security in the prison setting, as my colleague suggests in footnote 4 of her dissenting opinion, but to address the undisputed fact that neither the *Miranda* nor the *Fields* decisions involved corrections officers questioning inmates in a prison setting. While both these opinions discussed *factors* that could or should be applied to a given situation, the juxtaposition of those factors, as shown by the lead and the dissenting opinions, is significant to the protection of an inmate's Fifth Amendment rights.

The primary purpose of this opinion is to address the issue of *Miranda* warnings as they apply to inmates who are taken aside and questioned by *corrections officers* about events that have occurred *inside* the prison walls. Application of *Miranda*'s prophylactic measures in an established coercive environment such as a prison is the antithesis of applying the same measures to individuals in a free society. As both the lead and the dissenting opinions aptly point out, the application of these *same* factors to dissimilar situations (dissimilar from *Miranda*) will most certainly lead to divergent results.

BECKERING, J. (*dissenting*). I respectfully dissent from the lead opinion. Our task on remand is to determine whether, in light of the United States Supreme Court's decision in *Howes v Fields*, 565 US ___; 132 S Ct 1181; 182 L Ed 2d 17 (2012), defendant, Burton David Cortez, was entitled to be advised of his rights under *Miranda v Arizona*[1] before being interrogated about his alleged possession of two shanks—a violation of MCL 800.283(4)[2]—that were found in his prison cell at the time of a siren-drill cell search. I would hold that, on the basis of all the features of the interrogation in this instance, defendant should have been advised of his *Miranda* rights before questioning and, thus, that his subsequent confession should have been suppressed.

## I. PERTINENT FACTS

As summarized in our earlier opinion and recapped in the lead opinion, defendant was serving a prison sentence at the Carson City Correctional Facility at the time of the subject offense. On July 21, 2009, prison officials decided to conduct a "siren drill" to search for weapons after encountering several episodes of violence among the inmates and discovering two homemade weapons on an inmate who was a suspected gang member. Prison officials targeted defendant's cell among those to be searched. Pursuant to protocol, upon the initiation of a siren drill inmates are required to return to their cells for a lockdown. The corrections officers then search various cells

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[2] MCL 800.283(4) provides as follows:

Unless authorized by the chief administrator of the correctional facility, a prisoner shall not have in his or her possession or under his or her control a weapon or other implement which may be used to injure a prisoner or other person, or to assist a prisoner to escape from imprisonment.

for contraband. When a particular inmate's cell is going to be searched, the corrections officers have the inmate step out of the cell, undergo a pat-down search, and then proceed to a day room to await completion of the search.

When defendant's cell was to be searched, he was patted down and sent to the day room. Michigan Department of Corrections Officer Robert Hanes searched defendant's cell, which defendant shared with another inmate. Officer Hanes discovered two home-made metal shanks hidden in the cell in the area considered to be under defendant's control. He also found pieces of metal in what was considered to be defendant's trash can and noted that a metal shelf was missing from defendant's desk.

Pursuant to departmental policy, an inmate found with dangerous contraband is placed in segregation until his or her misconduct report is heard. Officer Hanes prepared a misconduct report regarding his findings in defendant's cell. Rather than returning defendant to his cell after the search, Lieutenant Robert Vashaw ordered staff members to escort defendant to a segregation cell or solitary confinement.

After some time in solitary confinement, defendant was handcuffed and taken by a staff member to a back office in the control center to meet with Lieutenant Vashaw, who was "an acting Inspector" for the facility. In his testimony about the incident, Lieutenant Vashaw did not claim to have obtained defendant's permission or consent for the interview or to have otherwise advised him that the meeting was optional. Lieutenant Vashaw did not claim to have told defendant at the meeting that defendant could end the questioning at any time, refuse to speak, or elect to leave and be escorted back to his cell upon request. Lieutenant Vashaw testified that, when he questioned defendant,

he had already "bagged and tagged" the shanks and placed them in the Michigan State Police evidence locker (it would not escape the mind of any corrections officer that an inmate's possession of shanks constitutes an offense subject to criminal prosecution). But, Lieutenant Vashaw thought he may have had with him in the interview room the trash can containing metal pieces, presumably remnants of the missing desk shelf used to craft the shanks.[3]

Lieutenant Vashaw testified that defendant hesitated to speak at the outset of the interrogation and "denied everything." Lieutenant Vashaw then told defendant that the evidence the corrections officers had obtained was "pretty damaging" and that two weapons had been found in defendant's area of control. Lieutenant Vashaw told defendant that he needed to tell him what was going on inside the prison. As soon as defendant started to talk, Lieutenant Vashaw pulled out a tape recorder and recorded defendant's confession, which was later given to the prosecution in order to help prove the instant criminal offense. After the interrogation, which lasted approximately 15 minutes, a staff member escorted defendant back to the segregation unit.

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion to suppress evidence. *People v Lapworth*, 273 Mich App 424, 426; 730 NW2d 258 (2006). However, we

---

[3] In our earlier opinion, we relate facts stated in testimony by defendant, including his claim that the shanks were in the interview room. Defendant did not, however, testify at the suppression hearing. As such, we are prohibited from considering in our analysis defendant's trial testimony when evaluating whether the trial court should have granted defendant's suppression motion on the basis of the failure to advise him of his *Miranda* rights.

defer to the trial court's findings of fact unless the findings are clearly erroneous. *People v Herndon*, 246 Mich App 371, 395; 633 NW2d 376 (2001). A finding is clearly erroneous if we are "left with a definite and firm conviction that a mistake has been made." *People v Muro*, 197 Mich App 745, 747; 496 NW2d 401 (1993).

### III. DISCUSSION

#### A. *MIRANDA*

The Fifth Amendment of the United States Constitution provides a right against self-incrimination: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." In *Miranda*, the Supreme Court of the United States established "procedural safeguards . . . to secure the privilege against self-incrimination." *Miranda*, 384 US at 444. Specifically, when a criminal defendant is subjected to a custodial interrogation, the defendant must be warned of the following before any questioning: he or she has the right to remain silent, any statement that the defendant makes may be used as evidence against him or her, and he or she has a right to an attorney, either retained or appointed. *Id.* A custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* When determining whether a defendant was "in custody" in the context of *Miranda*, courts consider (1) whether a reasonable person in the defendant's situation would believe that he or she was free to leave and (2) "whether the relevant environment present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Fields*, 565 US at ___; 132 S Ct at 1190. "Interrogation refers to express questioning and to any

words or actions on the part of police that the police should know are reasonably likely to elicit an incriminating response from the subject." *People v Raper*, 222 Mich App 475, 479; 563 NW2d 709 (1997). Statements made by a defendant during a custodial interrogation are inadmissible unless the defendant knowingly, voluntarily, and intelligently waived his or her Fifth Amendment rights. *People v Tierney*, 266 Mich App 687, 707; 703 NW2d 204 (2005); see also *Miranda*, 384 US at 444-445.

### B. *FIELDS*

The United States Supreme Court in *Fields* affirmed the longstanding principle that incarceration alone does not deprive a person of his or her Fifth Amendment right against self-incrimination. Rather, "[a]n inmate who is removed from the general prison population for questioning" and is thereafter subjected to treatment in connection with the interrogation that renders him or her "in custody" for practical purposes is "entitled to the full panoply of protections prescribed by *Miranda*." *Fields*, 565 US at ___; 132 S Ct at 1192 (quotation marks and citation omitted). But the Court rejected the idea of a categorical rule that deems any questioning of a prisoner custodial if he or she is removed from the general prison population and questioned. *Id.* at ___; 132 S Ct at 1187-1188. Instead, the determination of custody should focus on all the features of the interrogation and whether it manifests the coercive pressure that *Miranda* was designed to guard against—"the danger of coercion [that] results from the *interaction* of custody and official interrogation."[4] *Id.* at ___; 132 S Ct

---

[4] Upholding the tenets of *Miranda* in a prison setting does not necessarily hinder the safety and security of the facility, as my colleague suggests in his concurring opinion. Department of Corrections officers

at 1188 (quotation marks and citations omitted). Because we are tasked with determining whether defendant was entitled to "the full panoply" of protections prescribed by *Miranda* in light of the United States Supreme Court's ruling in *Fields*, its facts and analysis merit discussion.

In *Fields*, Randall Fields was serving a sentence in a Michigan jail when a corrections officer escorted him to a conference room that was "down one floor and ... through a locked door that separated two sections of the facility." *Id.* at ___; 132 S Ct at 1186. Fields arrived at the conference room between 7:00 p.m. and 9:00 p.m. *Id.* The room was well lit and "average" in size. *Id.* at ___; 132 S Ct at 1193. Two sheriff's deputies were in the conference room to interview Fields about allegations that Fields had had sexual contact with a 12-year-old boy before his incarceration. *Id.* at ___; 132 S Ct at 1185. The two deputies were armed, but Fields was not handcuffed, otherwise restrained, or uncomfortable. *Id.* at ___, ___; 132 S Ct at 1186, 1193. He was offered food and water. *Id.* at ___; 132 S Ct at 1193. Both at the beginning of and later in the interview, the deputies told Fields that he was free

___

are free to place prisoners in segregation as necessary, handcuff them during transport, and investigate, pursue, and punish acts of misconduct as well as crimes that occur within the prison. Furthermore, the right against self-incrimination does not prohibit corrections officers from interviewing inmates regarding their conduct. An inmate's statements are admissible in a future criminal proceeding: (1) if all the features of the interrogation do not amount to "custody" as set forth in *Miranda* and addressed in *Fields*; (2) when the questioning amounts to an on-the-scene investigation such as in *Cervantes v Walker*, 589 F2d 424, 427 (CA 9, 1978); or (3) in circumstances where "objectively reasonable question[ing is] necessary to protect the police or the public from an *immediate* danger." *People v Attebury*, 463 Mich 662, 671-672; 624 NW2d 912 (2001) (emphasis added). If circumstances mandate that the inmate be read his or her *Miranda* rights, violating such requirement merely results in an exclusion of the inmate's statements from being used as evidence against him or her in a criminal proceeding. Protecting the inmate's constitutional right in this regard should not jeopardize the safety and security of the prison facility.

to leave and return to his cell. *Id*. at ___; 132 S Ct at 1186. The conference-room door was open sometimes during the interview. *Id*. About halfway through the interview, Fields became agitated and began to yell after being confronted with the allegations of abuse. *Id*. According to Fields, one of the deputies spoke to him in "a very sharp tone" and, using an expletive, told him to sit down and that, " 'if [he] didn't want to cooperate, [he] could leave.' " *Id*. at ___, ___; 132 S Ct at 1186, 1193-1194. Fields eventually confessed to engaging in sexual conduct with the boy. *Id*. at ___; 132 S Ct at 1186. The questioning lasted between five and seven hours, and at no point during the interview did Fields ask to go back to his cell. *Id*. When Fields was eventually ready to go back to his cell, he had to wait 20 minutes for a corrections-officer escort. *Id*. He returned to his cell well after the hour of his normal bedtime. *Id*. "At no time was Fields given *Miranda* warnings or advised that he did not have to speak with the deputies." *Id*.

The state of Michigan charged Fields with criminal sexual conduct. *Id*. Fields moved the trial court to suppress his statements to the deputies, but the trial court denied the motion. *Id*. A jury convicted Fields of two counts of third-degree criminal sexual conduct. *Id*. This Court affirmed the conviction, and the Michigan Supreme Court denied leave to appeal. *Id*. Fields filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Michigan; the court granted Fields relief, *id*., concluding that this Court's "decision that [Fields's] confession was properly admitted was an unreasonable application of *Mathis* v. *United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968)[, and] that the error was not harmless." *Fields v Howes*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued February 9, 2009 (Docket No. 2:06-CV-13373, 2009 WL 304751), unpub op, p 9. The

United States Court of Appeals for the Sixth Circuit affirmed, opining that the Supreme Court of the United States "clearly established in *Mathis* . . . that '*Miranda* warnings must be administered when law enforcement officers remove an inmate from the general prison population and interrogate him regarding criminal conduct that took place outside the jail or prison.' " *Fields*, 565 US at ___; 132 S Ct at 1187, quoting *Fields v Howes*, 617 F3d 813, 820 (CA 6, 2010).

The United States Supreme Court granted certiorari and rejected the Sixth Circuit's characterization of Supreme Court precedent, opining that "our decisions do not clearly establish that a prisoner is always in custody for purposes of *Miranda* whenever a prisoner is isolated from the general prison population and questioned about conduct outside the prison." *Id.* at ___; 132 S Ct at 1188-1189. The Court emphasized that "imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*" for several reasons: (1) "questioning a person who is already serving a prison term does not generally involve the shock that very often accompanies arrest" because they "live in prison" where "the ordinary restrictions of prison life, while no doubt unpleasant, are expected and familiar"; (2) a prisoner is "unlikely to be lured into speaking by a longing for prompt release"; and (3) a prisoner "knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence." *Id.* at ___; 132 S Ct at 1190-1191 (quotation marks and citation omitted). In addition, the Court explained that questioning a prisoner outside the presence of other inmates "does not necessarily convert a noncustodial situation . . . to one in which *Miranda* applies" because such questioning "does not generally remove the prisoner from a supportive atmosphere." *Id.*

at ___; 132 S Ct at 1191 (quotation marks and citation omitted). Moreover, with respect to the subject matter of the questioning, the Court opined that the distinction between events occurring inside the prison and events occurring outside the prison is not significant because there is a potential for additional criminal liability and punishment in both instances. *Id.* at ___; 132 S Ct at 1192.

After rejecting the Sixth Circuit's "categorical rule" as "unsound," the Court explained the proper analysis to determine whether a prisoner is in custody for *Miranda* purposes:

> When a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation. These include the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted.[5] An inmate who is removed from the general prison population for questioning and is thereafter . . . subjected to treatment in connection with the interrogation that renders him in custody for practical purposes . . . will be entitled to the full panoply of protections prescribed by *Miranda*.
>
> Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated. [*Id.* at ___; 132 S Ct at 1192 (quotation marks and citations omitted).]

The Court then held that Fields was not in custody for purposes of *Miranda*. *Id.* at ___; 132 S Ct at 1194. The Court recognized that there were factors that supported a custody finding: Fields did not initiate or

---

[5] The *Fields* Court also listed several other factors to consider when examining "all of the circumstances surrounding the interrogation": the location and duration of the questioning, statements made during the interview, the presence or absence of physical restraints during the interview, and the release of the interviewee at the conclusion of questioning. *Id.* at ___; 132 S Ct at 1189 (quotation marks and citation omitted).

consent to the interview in advance, Fields was not told that he was free to decline to speak, the interview lasted five to seven hours and continued past Fields's regular bedtime, the deputies were armed, and one of the deputes spoke in "a very sharp tone" and used profanity. *Id.* at ___; 132 S Ct 1193. Nevertheless, the Court concluded that these factors were outweighed by other factors illustrating that Fields was not in custody: Fields was not physically restrained, threatened, or uncomfortable in the conference room, he was offered food and water, the conference room was well lit and "average" sized, and the conference-room door was sometimes left open. *Id.* But, the most important factor to the Court was that Fields was told both at the outset of the interview and again thereafter that he could return to his cell whenever he wanted. *Id.* According to the Court, " '[a]ll of these objective facts [were] consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave.' " *Id.*, quoting *Yarborough v Alvarado*, 541 US 652, 664-665; 124 S Ct 2140; 158 L Ed 2d 938 (2004).

### C. ANALYSIS

Focusing on all the features of Lieutenant Vashaw's interview of defendant, I would conclude that defendant was in custody during the interrogation for purposes of *Miranda.* See *Fields*, 565 US at ___; 132 S Ct at 1192. While defendant's cell was being searched during a siren drill, he was passing time in the day room along with other inmates. Instead of being returned to his cell after the search, however, defendant was ordered to be placed in the segregation unit. A prisoner is not typically placed in the segregation unit unless prison officials believe he or she has done something wrong, and a

reasonable person in defendant's situation could safely assume that to be the case. After some time had passed, defendant was then placed in handcuffs (not a normal situation for him) and taken to a back office of the control center, where Lieutenant Vashaw was waiting for him. A reasonable reading of the record indicates that defendant had no choice but to attend the meeting with Lieutenant Vashaw. Once in the interrogation room, Lieutenant Vashaw did not tell defendant that he could decline the interrogation, end it at any time, refuse to answer questions, or be returned to his cell—in the segregation unit or otherwise—upon request. It is also clear from the record that defendant was singled out for interrogation on the basis of the offense for which he was convicted in the instant case, even if an additional purpose of the interview was to investigate suspected gang violence in the prison. Defendant remained handcuffed during the interrogation. Early in the interrogation, defendant hesitated to speak and denied everything. However, defendant ultimately confessed once Lieutenant Vashaw told him about the discovery of two weapons in defendant's "area of control," that the evidence was "pretty damaging," and that defendant needed to tell him what was going on inside the prison. At no time was defendant told that he was free to leave. After defendant made incriminating statements regarding the weapons, the 15-minute interrogation ended, and defendant was taken back to the segregation unit.

In comparison to *Fields*, there are factors in the present case that suggest that defendant was not in custody. For example, Lieutenant Vashaw testified that he did not threaten defendant, other than his remarks as stated above. There is no indication that defendant was uncomfortable or subjected to expletives. There was one less interviewer than in *Fields*. There is no indication that Lieutenant Vashaw was armed as the deputies were in

*Fields*, and defendant's 15-minute interrogation was significantly shorter than the questioning in *Fields* (likely because defendant confessed quickly).

However, the present case and *Fields* share similarities that demonstrate that defendant was in custody. Here, as in *Fields*, defendant did not invite the interview. And, there is no indication that defendant was told that he could decline to speak with Lieutenant Vashaw. Furthermore, the present case is distinguishable from *Fields* in several respects that strongly illustrate that defendant was in custody. First, defendant's experience leading up to the interrogation supports the conclusion that a reasonable person in defendant's position would not have felt free to terminate the questioning and leave; the same cannot be said about the defendant in *Fields*. More specifically, Fields was taken directly from his jail cell to a conference room without any indication to him that he had done something wrong. *Fields*, 617 F3d at 815. In contrast, defendant here was awaiting the completion of a "shakedown"—a search of his cell—when he was handcuffed, taken out of the general prison population and into the segregation unit, and then, shortly thereafter, taken for questioning while he remained in handcuffs. A reasonable person in defendant's position would recognize, or at least suspect, that his placement in the segregation unit in physical restraints was directly linked to the shakedown of his prison cell. Second, defendant was not told that he was free to leave. Fields, however, was told both before and during his interview that he was free to leave, and the *Fields* Court characterized this fact as the "[m]ost important" circumstance of the interrogation. *Fields*, 565 US at ___; 132 S Ct at 1193. Third, defendant in this case was in handcuffs during the interrogation; Fields was not physically restrained. *Id*. Finally, defendant was returned to the segregation unit after the interrogation, whereas Fields was taken back to his cell. See *id*. at ___; 132 S Ct at 1189

(stating that the release of the interviewee at the end of the questioning is a relevant factor to consider when determining custody). I view this "treatment" of defendant as the functional equivalent of an arrest in a prison setting. The objective circumstances in this case demonstrate that a reasonable person would not have felt free to terminate the interrogation by Lieutenant Vashaw. See *id.* at ___; 132 S Ct at 1192 ("An inmate who is removed from the general prison population for questioning and is 'thereafter . . . subjected to treatment' in connection with the interrogation 'that renders him "in custody" for practical purposes . . . will be entitled to the full panoply of protections prescribed by *Miranda*.' ") (citation omitted).

The prosecution contends that, under *Fields*, defendant was not in custody for *Miranda* purposes because "[a]ll of the restrictions placed on him were a result of . . . standard prison policy for prisoners found to possess weapons. None of it was related to his questioning." I do not find this argument to be persuasive. *Fields* simply does not stand for the proposition that a prisoner is not in custody for purposes of *Miranda* when the treatment that the prisoner is subjected to is standard prison policy. Rather, when distinguishing a prisoner's living environment from the living environment of a person who is not serving a term of incarceration, the *Fields* Court focused on restrictions and prison procedures that are "ordinary" and "familiar" to a prisoner. *Id.* at ___; 132 S Ct at 1191-1192. The prosecution's argument takes the *Fields* Court's distinction between "ordinary" conditions of prisoners and "ordinary" conditions of people who are not serving a term of imprisonment to an extreme by presuming that all standard prison policies are ordinary and familiar to a prisoner. Being sent to a segregation unit in handcuffs following the discovery of weapons in a prison cell is no more an "ordinary" condition to a prisoner than being sent to jail in handcuffs following an arrest on a city

street is an "ordinary" condition to a person who is not serving a term of incarceration. Both are unordinary conditions brought about by prohibited conduct. Furthermore, the actions taken by law enforcement officers in both circumstances are executed pursuant to a standard policy.

The prosecution further contends that the public-safety exception to the *Miranda* rule applies in this case. I disagree. I recognize "that the doctrinal underpinnings of *Miranda* [do not] require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety." *New York v Quarles*, 467 US 649, 656; 104 S Ct 2626; 81 L Ed 2d 550 (1984). However, the public-safety exception only applies to "objectively reasonable question[ing] necessary to protect the police or the public from an *immediate* danger." *People v Attebury*, 463 Mich 662, 671-672; 624 NW2d 912 (2001) (emphasis added). In the present case, Lieutenant Vashaw's questioning of defendant was not "objectively reasonable question[ing] necessary to protect the police or the public from an immediate danger." *Id*. While Lieutenant Vashaw's questioning may have been connected to concerns for prison safety given the recent, problematic gang activity occurring in the prison, there was no immediate danger. See *id*. There was no active prison violence at the time of defendant's interview. Rather, there was a potential for more violence in the future and, thus, a need to determine the likelihood of future violence. Lieutenant Vashaw's testimony illustrates this fact:

> *Q*. And then at some point, do you decide, I've got to talk to defendant?
>
> *A*. Yes.

* * *

*Q.* And—and you wanted information on the gang members because of what reason?

*A.* For prison safety. *For future,* I mean, *if we got a war going on* that's something we need to take control of.

\* \* \*

*Q.* But again, you wanted to know what's going on because of what reason?

*A.* Prison safety, with—we're having these gang problems and I want to know *are we expecting more trouble,* are we—you know, *is there more weapons floating around out there,* you know, concerned about the prisoner and staff safety. [Emphasis added.]

As can be gleaned from Lieutenant Vashaw's testimony, there was a potential in the prison for a future danger to prisoner and staff safety given the recent events— but not an immediate danger. There was no exigency. The public-safety exception, therefore, does not apply in this case.

Accordingly, I would conclude that Lieutenant Vashaw's questioning of defendant was a custodial interrogation. Therefore, defendant's statements during the custodial interrogation were inadmissible at trial because he was not advised of his *Miranda* rights before questioning and, thus, did not knowingly, voluntarily, and intelligently waive his Fifth Amendment rights. See *Miranda,* 384 US at 444-445; see also *Tierney,* 266 Mich App at 707.

### D. HARMLESS ERROR

The erroneous admission into evidence of defendant's statements to Lieutenant Vashaw, a preserved constitutional error occurring during the presentation of the case to a jury (i.e., a nonstructural error), is not grounds for reversal if the error was harmless. See

*People v Miller*, 482 Mich 540, 559; 759 NW2d 850 (2008); *People v Anderson (After Remand)*, 446 Mich 392, 406; 521 NW2d 538 (1994). A preserved constitutional error is harmless if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *People v Hyde*, 285 Mich App 428, 447; 775 NW2d 833 (2009) (quotation marks and citations omitted). "There must be no reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* (quotation marks and citations omitted); see also *Anderson*, 446 Mich at 406; *Chapman v California*, 386 US 18, 23; 87 S Ct 824; 17 L Ed 2d 705 (1967).

Given the evidence at trial, I would conclude that the admission into evidence of defendant's statements to Lieutenant Vashaw was not harmless error. It is not "clear beyond a reasonable doubt that a rational jury would have found ... defendant guilty absent the error." See *Hyde*, 285 Mich App at 447 (quotation marks and citations omitted). To be convicted of being a prisoner in possession of a weapon, MCL 800.283(4) requires that a prisoner either possess a weapon or have a weapon under his or her control. See MCL 800.283(4) ("Unless authorized by the chief administrator of the correctional facility, a prisoner shall not have in his or her possession or under his or her control a weapon or other implement which may be used to injure a prisoner or other person, or to assist a prisoner to escape from imprisonment."). The significance of defendant's inadmissible statements to Lieutenant Vashaw lies in the statements' relevance to whether defendant possessed or controlled the prison shanks. See *id.* Defendant told Lieutenant Vashaw that the shanks were his and that he made them. Defendant testified at trial, however, that the shanks belonged to his cellmate and that he had never seen them before they were confiscated as a

result of the search. Moreover, the shanks were not found on defendant's person but, rather, under the bed frame of his bunk and in his mattress. Thus, whether the shanks belonged to defendant and whether defendant knew that the shanks were under the bed frame and in his mattress were very significant factual questions with respect to whether defendant possessed or controlled the shanks. The evidence at trial demonstrating that defendant had control over the area where the shanks were found supports the reasonable inference that the shanks belonged to defendant and that he knew where they were. However, defendant's inadmissible statements to Lieutenant Vashaw directly prove these significant facts and, thus, that the shanks were under defendant's possession and control. Without this inadmissible direct evidence, a trier of fact would have to rely on the circumstantial evidence of possession and control offered by the prosecution and could find that the shanks did not belong to defendant and that defendant did not know they were there. There is, therefore, a reasonable possibility that defendant's statements to Lieutenant Vashaw might have contributed to defendant's convictions. See *Hyde*, 285 Mich App at 447.

Accordingly, I would conclude that the admission into evidence of defendant's statements to Lieutenant Vashaw was not harmless beyond a reasonable doubt. I would, therefore, reverse defendant's convictions and remand for a new trial.