*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* NC, Minor.

---

PEOPLE OF THE STATE OF MICHIGAN,

    Petitioner-Appellant,

v

NC,

    Respondent-Appellee.

FOR PUBLICATION
November 21, 2023
9:15 a.m.

No. 361548
Alger Circuit Court
Family Division
LC No. 20-004569-DL

---

Before: GLEICHER, C.J., and SWARTZLE and YATES, JJ.

GLEICHER, C.J.

Nine days after the Oxford High School shooting, a junior high school student in Munising found a threatening note in a school bathroom. School officials called the police and locked down the school. Suspicion soon fell on NC, who was removed from his class and questioned in the principal's office by the Munising Chief of Police. The question presented in this interlocutory appeal is whether NC was in custody during the interview and should have been advised of the rights described in *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). The trial court suppressed NC's statements, finding the interview custodial. We affirm.

## I. BACKGROUND

In the morning of December 9, 2021, just over a week after the Oxford school shooting in Michigan, Police Chief John Nelson arrived at NC's school to investigate a shooting threat after a student found a note in the girls' bathroom. Peter Kelto, the school superintendent, and Mike Travis, the school principal, discussed the situation with Nelson, and they placed the school on lockdown. During the lockdown, someone shared with school staff a video showing then 13-year-old NC holding a shotgun and pointing it at the camera. The video included text saying, "be ready tmrw," meaning "be ready tomorrow." The video became the focus of the authorities' investigation. The note in the girls' bathroom was never attributed to NC.

Nelson had coached NC in youth sports for many years, and his son was a friend of NC's. Nelson did not recall ever having contacted NC in a law-enforcement capacity, but he knew that NC had "contact in a criminal context" with other officers in his department. Kyle Connaughton,[1] NC's father, testified that NC was in the court system one other time and had gone through "the Diversion Program."

Nelson testified that within five minutes of reviewing the video, he and Travis removed NC from his classroom. Nelson did not initially talk to NC after he was pulled from class, and Travis never informed NC why he was being removed. Nelson was in full uniform and carried a loaded firearm as the three men escorted NC from his classroom to the high school office. Travis and Nelson deposited NC in the main office to wait for his father to arrive.

After Kyle's arrival and with Travis present, Nelson told Kyle about the video and the need to question NC about it. Nelson acknowledged that he never told Kyle that he wanted to question NC about a potential crime. Nelson and Travis then escorted Kyle into Travis's office, which was directly adjacent to the main office. NC had remained seated alone in the main office for approximately 30 or 40 minutes before the interview began. Kyle recounted that when he first saw NC in the office, an officer stood nearby.

Nelson interviewed NC in Travis's office. NC sat directly across from Nelson at a meeting table, and Kyle was to NC's left. Travis sat at his desk toward the back of the room. Travis's office doors remained closed during the interview. The interview was relatively brief, 30 minutes at most,[2] and Nelson was the primary questioner. Nelson began by telling NC about the "disturbing" video school staff received, and asked NC to explain. NC told Nelson he understood, explaining that he made the video a while ago—approximately one week before—and sent it to a friend who edited it, inserted music, and sent it back to him. Ultimately someone shared the video with a private group of friends on social media around the same time it had been made. Nelson observed that the contents and timing of the video were concerning given the recent shooting at Oxford High School. NC responded that the video and its "be ready tomorrow" warning were "in reference to a school shooting," but he said it was only a joke. Kyle did not participate in the interview.

Nelson never gave NC *Miranda* warnings because he did not believe NC was in custody. Nelson also never told NC that "he was gonna be under arrest" or that "he wasn't gonna be able to go home." Nelson acknowledged never telling Kyle or NC that NC was free to leave, or that they could contact a lawyer. Kyle similarly testified that Nelson never asked him for permission to interview NC, told him that he and NC were free to leave the interview, or informed him that he and NC could consult a lawyer. Kyle did not believe he was able to remove NC from the school or from the interview.

---

[1] We refer to NC's father as "Kyle."

[2] According to Nelson, the interview lasted approximately five minutes. Travis testified that the interview lasted approximately 30 minutes. Kyle testified that the interview lasted 15 or 20 minutes at minimum, and that he and NC "were outta there in 30."

Kyle testified that he asked for permission to support NC during the interview, and that he believed the only reason he was permitted to be present was because he promised to be a silent observer. Nelson denied ever telling Kyle to be quiet, that he could not speak, or that he could not interfere with what was going on. But Nelson conceded that it was very possible Kyle asked whether he could silently observe the interview. Nelson also conceded that he never told Kyle that "he didn't have to be silent" during the interview.

Travis insisted that he never told NC or Kyle that they were forbidden from leaving before or during the interview, or that Kyle could not speak during the questioning. Travis conceded, however, that in his experience students rarely terminated a conversation with the principal, an act potentially punishable as insubordination. Travis conceded that being interviewed by the police at school can be intimidating, and he agreed that most ordinary 13-year-olds would not walk out of a conversation with the school principal or feel as if they could just get up and leave, let alone during an interview that also involved the police and potentially the school superintendent. Travis believed this to be especially true when a student's parent had been summoned to a meeting.

Nelson testified that NC seemed reasonably intelligent and did not appear to be injured, visibly intoxicated, physically abused or threatened, or deprived of food, sleep, or medical attention. Kyle, however, testified that NC appeared confused, trembly, and scared during the interview. NC was not physically restrained or handcuffed, and the interview was unrecorded. The school remained on lockdown throughout the interview. NC was not arrested that day, and he left with Kyle. Travis suspended respondent from school for 10 days because of the video.

The prosecution charged NC with making a false report or threat of terrorism contrary to MCL 750.543m,[3] and an intentional threat to commit an act of violence against students or school employees on school grounds or school property contrary to MCL 750.235b(1).[4] NC moved to

---

[3] MCL 750.543m provides:

      (1) A person is guilty of making a terrorist threat or of making a false report of terrorism if the person does either of the following:

      (a) Threatens to commit an act of terrorism and communicates the threat to any other person.

      (b) Knowingly makes a false report of an act of terrorism and communicates the false report to any other person, knowing the report is false.

      (2) It is not a defense to a prosecution under this section that the defendant did not have the intent or capability of committing the act of terrorism.

      (3) A person who violates this section is guilty of a felony punishable by imprisonment for not more than 20 years or a fine of not more than $20,000.00, or both.

[4] MCL 750.235b(1) provides, in relevant part:

suppress his statements to Nelson, arguing that Nelson subjected him to a custodial interrogation without providing *Miranda* warnings. The prosecution responded that NC's interview was noncustodial, obviating the need for *Miranda* warnings. At a hearing, the trial court acknowledged that some facts weighed against the need for *Miranda* warnings, including (1) the brevity of the interview, (2) the absence of any coercive or repetitive questions, (3) Kyle's presence, (4) that NC was not arrested, restrained, or physically prevented from leaving, and (5) that NC was permitted to leave with Kyle after the interview.

Nevertheless, the court concluded that NC was in police custody during the interview. The court determined that an objective, reasonable 13-year-old in NC's position "would've felt that he could not leave the principal's office during the question[ing] by Chief Nelson." The court noted the existence of inherently coercive factors during the interview, including the location of the questioning in the principal's office, the formality of the interview, Kyle's silence throughout, and the "lack of acknowledgment [by Nelson or Tavis] of the freedom to leave." The court also noted Kyle's testimony that NC appeared scared and trembly during the interview.

The court further reasoned:

[T]his is no seasoned criminal that's sitting in the principal's office waiting to talk to police. This is a young man who's frightened, who's scared, and who has a— who has a lot to be frightened and scared about because he has triggered this avalanche of responses that I don't think for a second, he thought was going to happen . . . .

And the [c]ourt wants to reflect back to that testimony, is—we had a young man in class, he was taken out by the principal, escorted by law enforcement to a place where he was held within eyesight of everyone, no cuffs, but, certainly, [NC] did not feel like he could leave that—that place until the questioning took place. And his dad comes in, there's a situation where we go into the principal's office and there's no question that this is not a school questioning any longer this is a law enforcement questioning because Mr. Travis leaves the table and goes to his computer and begins work independent of what's happening during this questioning period. This is absolutely law enforcement. It's exclusively law enforcement and it takes place while Mr. Travis is working up the suspension of [NC]. There's some testimony that Mr. Travis added in a thought, or a concept, whether or not, geez, this is real concerning because it comes so close to Oxford, but that isn't the end all and be all, and it's clear that Chief Nelson was the one

---

A person who verbally, through the use of an electronic device or system, or through other means intentionally threatens to use a firearm . . . to commit an act of violence against any students or school employees on school grounds or school property if the threat can be reasonably interpreted to be harmful or adverse to human life, or dangerous to human life as that term is defined in [MCL 750.543b], is guilty of a misdemeanor punishable by imprisonment for not more than 1 year or a fine of not more than $1,000.00, or both.

doing that questioning and that at that point it effectively created a transition from school custody to inferred law enforcement custody that a reasonable 13-year-old would have been in a position to contemplate.

The court ruled that Nelson should have given NC *Miranda* warnings before questioning him, and granted NC's motion to suppress. We granted the prosecution's application for leave to appeal.

## II. ANALYSIS

The prosecution argues that NC's statements should not have been suppressed. According to the prosecution, the trial court improperly focused only on the fact that NC was not advised that he was free to leave, and therefore clearly erred by finding that NC was in custody, necessitating *Miranda* warnings.

"Whether a person is in custody for purposes of the *Miranda* warnings requirement is a mixed question of law and fact that must be answered independently after a review of the record de novo." *People v Cortez (On Remand)*, 299 Mich App 679, 691; 832 NW2d 1 (2013). This Court reviews "for clear error a trial court's factual findings regarding the circumstances surrounding the giving of the statement," but it reviews "de novo the trial court's ultimate decision concerning a motion to suppress." *Id*. "A finding is clearly erroneous if, after reviewing the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *People v Barritt*, 325 Mich App 556, 561; 926 NW2d 811 (2018) (quotation marks and citation omitted).

The trial court did not clearly err by finding that Nelson subjected NC to a custodial interrogation. The totality of the circumstances support that Nelson subjected NC to a custodial interrogation, and the trial court properly suppressed NC's statements to Nelson because he was not given *Miranda* warnings.

The right against self-incrimination is guaranteed by both the United States and Michigan Constitutions. US Const, Am V; Const 1963, art 1, § 17; *Barritt*, 325 Mich App at 561; *Cortez*, 299 Mich App at 691. To protect this right, police must generally precede any "custodial interrogation" with adequate *Miranda* warnings. See *Cortez*, 299 Mich App at 691, quoting *Miranda*, 384 US at 444. " '[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Barritt*, 325 Mich App at 562. Because *Miranda* warnings are meant to "protect the individual against the coercive nature of custodial interrogation," they are not required unless "there has been such a restriction on a person's freedom as to render him in custody." *JDB v North Carolina*, 564 US 261, 270; 131 S Ct 2394; 180 L Ed 2d 310 (2011) (quotation marks and citations omitted). "Statements made by a defendant to the police during a custodial interrogation are not admissible unless the defendant voluntarily, knowingly, and intelligently waives the constitutional right against self-incrimination." *Barritt*, 325 Mich App at 561-562.

"[T]o determine whether a defendant was in custody at the time of the interrogation," this Court must "look at the totality of the circumstances." *Cortez*, 299 Mich App at 691. The inquiry is objective, and we must "consider both whether a reasonable person in the defendant's situation

would believe that he or she was free to leave and whether the relevant environment present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* at 691-692 (quotation marks and citations omitted; alteration in original). Various factors are relevant to whether a reasonable person would have felt free to leave, including but not limited to: "(1) the location of the questioning . . . ; (2) the duration of the questioning . . . ; (3) statements made during the interview . . . ; (4) the presence or absence of physical restraints during the questioning . . . ; and (5) the release of the interviewee at the end of the questioning[.]" *Barritt*, 325 Mich App at 562-563. Additionally, if the suspect is a juvenile, this Court may objectively consider the juvenile's age when determining whether he or she would have felt free to leave or to terminate the encounter "so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer." *JDB*, 564 US at 271-272, 277. "It is beyond dispute that children will often feel bound to submit to police questioning when an adult in the same circumstances would feel free to leave." *Id.* at 264-265.

While there is significant caselaw addressing the role that a juvenile's age plays in the *Miranda* custody analysis, see, e.g., *id.*; *People v Elliot*, 494 Mich 292, 310 n 9; 833 NW2d 284 (2013), no binding Michigan caselaw has substantively addressed the situation we confront here: questioning a juvenile in a school or a principal's office. In *People v Mayes*, 202 Mich App 181; 508 NW2d 161 (1993), this Court briefly discussed but did not resolve a custody issue under similar circumstances, and instead addressed whether the juvenile's trial counsel was ineffective for failing to move to suppress the defendant's confession. *Id.* at 190. The juvenile defendant in *Mayes* was a senior in high school who "was summoned to the principal's office at his school" and subsequently frisked and interrogated by a police officer. *Id.* This Court concluded that the juvenile's attorney was not ineffective for failing to move to suppress his inculpatory statements because the *Miranda* issue "could have gone either way." *Id.* at 189-191.

The *Mayes* Court reasoned that there were facts that both supported and undermined a conclusion that the juvenile would not have felt free to leave under the totality of the circumstances. See *id.* at 190-191. The Court reasoned that:

> Although[] the police officer testified that [the] defendant was free to leave at any time, there was no evidence that this message was conveyed to [the] defendant. These facts could support a finding that [the] defendant reasonably believed that he was not free to leave. On the other hand, no one ever told [the] defendant that he was under arrest, and he was permitted to leave the principal's office after being questioned. The detention was brief and occurred in a school principal's office rather than at the police station or a squad car. Thus, the questioning was noncustodial, and the environment was not police dominated. Considering the totality of the circumstances, one could make an argument that defendant was effectively under arrest. *Id.* (quotation marks and citations omitted).

The United States Supreme Court in *JDB*, 564 US at 276, though focused on whether a juvenile's age at the time of questioning is relevant to the custodial-interrogation analysis, also noted that "the effect of the schoolhouse setting cannot be disentangled from the identity of the person questioned," and that the juvenile's "presence at school is compulsory and [his or her] disobedience at school is cause for disciplinary action." Following *JDB*, several states have held

that a juvenile being questioned at a school or in a principal's office is relevant to whether the juvenile was subjected to a custodial interrogation.

The North Carolina Court of Appeals concluded that "the schoolhouse is a unique forum because schoolchildren inherently shed some of their freedom of action when they enter the schoolhouse door, given educators' need to control the school environment," holding that a juvenile is "under custodial interrogation when he [or she] is subjected to additional restraints beyond those generally imposed during school." *In the Matter of DAH*, 277 NC App 16, 23; 857 SE2d 771 (2021) (quotation marks and citations omitted). See also *Holguin v Harrison*, 339 F Supp 2d 1052, 1058 (ND Cal, 2005) (juvenile was in custody during police questioning in the school principal's office, in part, because the interrogation "took place in a disciplinary setting where a reasonable student, such as [the juvenile], would feel compelled to obey authority and answer questions when asked."). The *DAH* Court further held that "an interview that features heavy [officer] involvement or direction will often qualify as a custodial interrogation," and the mere presence of an officer during an interrogation, "even when the [officer] remains silent," "can create a coercive environment that goes above and beyond the restrictions normally imposed during school, such that a reasonable student would readily believe they are not free to go." *DAH*, 277 NC App at 28-29. But see *MH v State*, 851 So 2d 233, 233-234 (Fla App, 2003) ("The mere presence of a law enforcement officer, when a student is being questioned by a school official, does not amount to a custodial interrogation requiring *Miranda* warnings.").

The Indiana Supreme Court also determined that police questioning of a juvenile in a principal's office "points toward custody" because "no student feels free to just walk out of the principal's office[.]" *BA v State*, 100 NE3d 225, 232 (Ind, 2018). Similarly, the Ohio Court of Appeals stated that "most children confronted by an adult authority figure asking about an incident at school would not feel free just to walk away," and it found the juvenile in custody when interviewed at school by a law enforcement official where an active police investigation was underway, the school was placed on lockdown, and the student was retrieved for questioning and interviewed by various law enforcement personnel. *In re LG*, 82 NE3d 52, 56 (Ohio App, 2017).

Additionally, in *NC v Commonwealth*, 396 SW3d 852, 855 (Ky, 2013), the Kentucky Supreme Court addressed whether a student subject to criminal charges "is entitled to the benefit of the *Miranda* warnings before being questioned by a school official in conjunction with a law enforcement officer." The Court noted that "the absence of law enforcement involvement is a significant factor that demonstrates when *Miranda* warnings are not implicated." *Id*. at 856. However, the Court held that the juvenile was subjected to a custodial interrogation and entitled to *Miranda* warnings, reasoning as follows:

> The facts of this case demonstrate that [the juvenile] was in custody under the "all relevant factors" test set forth in [*JDB*, 564 US at 280]. He was taken from his classroom by a law enforcement officer, who was clearly identified as such, and who wore a gun. He was seated in the assistant principal's office, and the door was shut. The law enforcement officer sat down right beside him, across from the assistant principal. The assistant principal testified that he expected [the juvenile] to stay put, which was no doubt conveyed by his demeanor.

Neither the officer nor the assistant principal told [the juvenile] that he was free to leave. His mother was not contacted and told of the charges until after the questioning and confession. His first responses indicated that he believed that he was subject to school discipline. He was initially questioned by the assistant principal instead of the officer, thereby leading him to believe this was only a school discipline matter. The record does not indicate a lack of respect toward the school official indicative of a belief that he did not have to be there and talk. [*Id*. at 862.]

The Court concluded, "No reasonable student, even the vast majority of seventeen year olds, would have believed that he was at liberty to remain silent, or to leave, or that he was even admitting to criminal responsibility under these circumstances." *Id.*

Similarly, the Minnesota Court of Appeals held that a juvenile was in custody during police interviews at school under the following circumstances:

Here we have a 14–year old boy, by all accounts, a child of average intelligence and maturity for his age. Before the October 10 interview, M.A.K. had no experience with the police or with police questioning. M.A.K. was removed from his class and escorted to the school police liaison office without being told why. Upon arrival, he was told he was not under arrest, but was not told that he was free to leave or that he was free to refuse to answer questions. He was not asked if he wished to speak with his parents or return to class. M.A.K. was given a hall pass and allowed to return to class only after police were satisfied with his statements. [*In re Welfare of MAK*, 667 NW2d 467, 472 (Minn App, 2017).]

Given these facts, the Court concluded that a reasonable person in MAK's position would not have felt free to leave. *Id.*

We find these cases persuasive and hold that while the fact that police questioning occurred at school or in a principal's office *alone* is not dispositive of custody, it is still a highly relevant factor to consider in a *Miranda* custody analysis involving juveniles at school. Indeed, the movements of a juvenile at school are generally restricted in ways not ordinarily applicable to adults. Thus, that a juvenile was interviewed by law enforcement at school or in a principal's office, along with the circumstances surrounding the questioning, are relevant considerations in a custody analysis.

Here, the trial court found that the totality of the circumstances supported that Nelson subjected NC to a custodial interrogation, and we are not firmly and definitely convinced this determination was mistaken. Contrary to the prosecution's argument, the court did not ignore the totality of the circumstances and unduly rely only on that fact that NC was never advised that he was free to leave. Indeed, the court explicitly mentioned various facts weighing against NC being in custody—specifically, it noted (1) the brevity of the interview, (2) the lack of any coercive or repetitive questions, (3) Kyle's presence, (4) that NC was not arrested, restrained, or physically prevented from leaving, and (5) that NC was permitted to leave with Kyle after the interview. We also recognize that NC had a previous encounter with law enforcement and a preexisting relationship with Nelson, potentially alleviating any inherent coerciveness present during the interview.

Nevertheless, NC was a 13-year-old boy at the time of the interview. NC was removed from his classroom by Travis, the principal, who was accompanied by Nelson, an armed police officer in full uniform. Travis and Nelson escorted NC to the main office without explanation, where he was required to wait with an officer nearby. The backdrop was a school in lockdown; students were not free to leave or move about the school. Nelson acknowledged that the interview occurred while the school remained in "a shelter in place environment" and that this environment "could be a . . . stressful situation" for some students. Travis agreed that a "shelter in place" environment is an "incredibly stressful and heightened" environment.

Travis confirmed that students, especially 13-year-olds, would not feel free to just get up and leave a meeting in the principal's office, particularly with law enforcement and a parent present. Indeed, Travis stated that a student's attempts to walk out of a conversation with the principal "could be considered insubordination," and he agreed that "[m]ost ordinary 13-year-olds" would not feel as if "they could just get up and leave" while being interviewed by an officer in the principal's office because it is "an intimidating situation." Moreover, Nelson, not Travis, conducted the interview. Travis's office doors were closed throughout the questioning. Neither NC nor Kyle was told that NC was free to leave the interview, that NC did not have to answer Nelson's questions, or that he could consult a lawyer. And although Kyle was present during the interview, he did not participate. Kyle believed that he was not free to withdraw NC from the interview and leave, and that he was permitted at the interview only as a silent observer.

These facts sufficiently support that Nelson subjected NC to a custodial interrogation. Specifically, the location of the interview, NC's young age, the manner in which the interview was initiated and conducted, the school's lockdown, and the failure to inform NC that he was free to leave or free to refuse to answer Nelson's questions support that NC was in police custody. See *JDB*, 564 US at 271-272, 277; *Barritt*, 325 Mich App at 562-563. A school environment can be deemed coercive given that a student's freedom of movement is restricted, see *DAH*, 277 NC App 23, 28-29, and "the effect of the schoolhouse setting cannot be disentangled from the identity of the person questioned," *JDB*, 564 US at 276. The school's lockdown status here only increased the inherent coerciveness of the interview. See *In re LG*, 82 NE3d at 56; *NC*, 396 SW3d at 862. Further, that respondent was interrogated by an officer in the principal's office "points toward custody" because "[o]f course, no student feels free to just walk out of the principal's office[.]" *BA*, 100 NE3d at 232.

NC was questioned by law enforcement in an environment and under circumstances suggesting he was not free to leave, and he was never told that he could leave at any time. As the trial court acknowledged, some facts weigh against a finding of custody. But we find no clear error in the trial court's finding that under the totality of the circumstances, *Miranda* warnings were required. The trial court properly suppressed NC's statements to Nelson.

We affirm.

/s/ Elizabeth L. Gleicher
/s/ Brock A. Swartzle
/s/ Christopher P. Yates